(Slip Opinion)     OCTOBER TERM, 2006     1

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## UTTECHT, SUPERINTENDENT, WASHINGTON STATE PENITENTIARY *v.* BROWN

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

No. 06–413.   Argued April 17, 2007—Decided June 4, 2007

A Washington jury sentenced respondent Brown to death, and the state appellate courts affirmed. Subsequently, the Federal District Court denied Brown's habeas petition, but the Ninth Circuit reversed, finding that under *Witherspoon* v. *Illinois*, 391 U. S. 510, and its progeny, the state trial court had violated Brown's Sixth and Fourteenth Amendment rights by excusing "Jurors Z" for cause on the ground that he could not be impartial in deciding whether to impose a death sentence.

*Held:*

   1. Courts reviewing claims of error under *Witherspoon* and *Wainwright* v. *Witt*, 469 U. S. 412, especially federal habeas courts, owe deference to the trial court, which is in a superior position to determine a potential juror's demeanor and qualifications. This Court's precedents establish at least four relevant principles. First, a criminal defendant has the right to an impartial jury drawn from a venire that has not been tilted in favor of capital punishment by selective prosecutorial challenges for cause. *Witherspoon*, *supra,* at 521. Second, the State has a strong interest in having jurors who are able to apply capital punishment within the framework state law prescribes. *Witt*, 469 U. S., at 416. Third, to balance these interests, a juror who is substantially impaired in the ability to impose the death penalty under the state-law framework can be excused for cause, but if the juror is not so impaired, removal for cause is impermissible. *Id.*, at 424. Fourth, in determining whether a potential juror's removal would vindicate the State's interest without violating the defendant's right, the trial court bases its judgment in part on the juror's demeanor, a judgment owed deference by reviewing courts. *Id.*, at 424–

434. The trial court is in a superior position to assess demeanor, a factor critical in assessing the attitude and qualifications of potential jurors. *Id.*, at 428. The Antiterrorism and Effective Death Penalty Act of 1996's requirements provide additional, and binding, directions to accord deference, creating an independent, high standard to be met before a federal court may issue a habeas writ to set aside state-court rulings. By not according the required deference here, the Ninth Circuit failed to respect the limited role of federal habeas relief in this area. Pp. 2–7.

2. In applying the *Witherspoon-Witt* rule*,* it is instructive to consider the entire *voir dire* in Brown's case and then turn to Juror Z's questioning. Pp. 7–12.

(a) Here, 11 days of *voir dire* were devoted to determining whether potential jurors were death qualified. During that phase, 11 of the jurors the defense challenged for cause were excused. The defense objected to 7 of the 12 jurors the State challenged for cause, and only 2 of those 7 were excused. Before deciding a contested challenge, the court allowed each side to explain its position and recall a potential juror. It also gave careful and measured explanations for its decisions. Before individual oral examination, the court distributed a questionnaire asking jurors to explain their attitudes toward the death penalty and explained that Brown was only eligible for death or life in prison without possibility of release or parole. It repeated the sentencing options before Juror Z's group was questioned. Pp. 7–10.

(b) The transcript reveals that, despite the preceding instructions and information, Juror Z had both serious misunderstandings about his responsibility as a juror and an attitude toward capital punishment that could have prevented him from returning a death sentence under the facts of this case. He was told at least four times that Brown could not be released from prison and stated six times that he could follow the law. But he also gave more equivocal statements that he would consider the death penalty only if there was no possibility that Brown would be released to reoffend. When the State challenged Juror Z on the grounds that he was confused about the conditions under which death could be imposed and seemed to believe it only appropriate when there was a risk of release and recidivism, the defense volunteered that it had no objection. Pp. 10–12.

3. The Ninth Circuit erred in holding that both the state trial court's excusal of Juror Z and the State Supreme Court's affirmance were contrary to, or an unreasonable application of, clearly established federal law. Pp. 12–19.

(a) Contrary to the Ninth Circuit's conclusion, the State Supreme Court explicitly found that Juror Z was substantially impaired. Even

absent this explicit finding, the only fair reading of the opinion is that the state court applied the *Witt* standard in assessing his excusal. Regardless, there is no requirement in a case involving the *Witt-Witherspoon* rule that a state appellate court make particular reference to each juror's excusal, for it is the trial court's ruling that counts. Pp. 12–14.

(b) On this record, the trial court acted well within its discretion in granting the State's motion to excuse Juror Z. His answers, on their face, could have led the trial court to believe that he would be substantially impaired in his ability to impose the death penalty absent the possibility that Brown would be released and would reoffend. The trial court, furthermore, is entitled to deference because it had an opportunity to observe Juror Z's demeanor. The State's challenge, Brown's waiver of an objection, and the trial court's excusal of Juror Z support the conclusion that the interested parties all felt that removal was appropriate under the *Witherspoon-Witt* rule. While there is no independent federal requirement that a state-court defendant object to the prosecution's challenge to preserve a *Witherspoon* claim, voluntary acquiescence to, or confirmation of, a juror's removal can be taken into account. The defense did not just deny a conscientious trial judge an opportunity to explain his judgment or correct an error; it also deprived reviewing courts of further factual findings to help explain the trial court's decision. The need to defer to the trial court's demeanor decision does not foreclose the possibility of reversal where the record discloses no basis for a substantial impairment finding, but the record here does not show the trial court exceeded its discretion in excusing Juror Z. The State Supreme Court recognized the deference owed and, contrary to the Ninth Circuit's misreading of its opinion, identified the correct standard required by federal law and found it satisfied. Pp. 14–17.

(c) The Court is not persuaded by Brown's additional arguments to depart from the State Supreme Court's determination of the state law at issue or to ignore Brown's failure to object to Juror Z's excusal. Pp. 17–19.

451 F. 3d 946, reversed and remanded.

KENNEDY, J., delivered the opinion of the Court, in which ROBERTS, C. J., and SCALIA, THOMAS, and ALITO, JJ., joined. STEVENS, J., filed a dissenting opinion, in which SOUTER, GINSBURG, and BREYER, JJ., joined. BREYER, J., filed a dissenting opinion, in which SOUTER, J., joined.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

————

No. 06–413

————

## JEFFREY UTTECHT, SUPERINTENDENT, WASHINGTON STATE PENITENTIARY, PETITIONER *v.* CAL COBURN BROWN

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

[June 4, 2007]

JUSTICE KENNEDY delivered the opinion of the Court.

Respondent Cal Coburn Brown robbed, raped, tortured, and murdered one woman in Washington. Two days later, he robbed, raped, tortured, and attempted to murder a second woman in California. Apprehended, Brown confessed to these crimes and pleaded guilty to the California offenses, for which he received a sentence of life imprisonment. The State of Washington, however, sought the death penalty and brought Brown to trial. Based on the jury's verdicts in the guilt and sentencing phases of the trial, Brown was sentenced to death. His conviction and sentence were affirmed by the Supreme Court of the State of Washington. *State* v. *Brown*, 132 Wash. 2d. 529, 940 P. 2d 546 (1997) (en banc).

Brown filed a petition for writ of habeas corpus in the United States District Court for the Western District of Washington. The District Court denied the petition, App. to Pet. for Cert. 77a–79a, 91a, but the United States Court of Appeals for the Ninth Circuit reversed. *Brown* v. *Lambert*, 451 F. 3d 946 (2006). The Court of Appeals consid-

ered, among other arguments for setting aside the capital sentence, the contention that under *Witherspoon* v. *Illinois*, 391 U. S. 510 (1968), and its progeny, the state trial court had violated Brown's Sixth and Fourteenth Amendment rights by excusing three potential jurors—whom we refer to as Jurors X, Y, and Z—for cause. The State moved to excuse these jurors due to the concern that they could not be impartial in deciding whether to impose a death sentence. The Court of Appeals held it was proper to excuse Jurors X and Y, but agreed with the defense that it was unconstitutional to excuse Juror Z for cause. On this premise the court held that Brown's death sentence could not stand, requiring that Brown receive a new sentencing trial more than a decade after his conviction.

We granted certiorari, 549 U. S. __ (2007), and we reverse the judgment of the Court of Appeals.

I

When considering the controlling precedents, *Witherspoon* is not the final word, but it is a necessary starting point. During the *voir dire* that preceded William Witherspoon's capital trial, the prosecution succeeded in removing a substantial number of jurors based on their general scruples against inflicting the death penalty. The State challenged, and the trial court excused for cause, 47 members of the 96-person venire, without significant examination of the individual prospective jurors. 391 U. S., at 514–515; see also Brief for Petitioner in *Witherspoon* v. *Illinois,* O. T. 1967, No. 1015, p. 4. The Court held that the systematic removal of those in the venire opposed to the death penalty had led to a jury "uncommonly willing to condemn a man to die," 391 U. S., at 521, and thus "woefully short of that impartiality to which the petitioner was entitled under the Sixth and Fourteenth Amendments," *id.*, at 518. Because "[a] man who opposes the death penalty, no less than one who

favors it, can make the discretionary judgment entrusted to him by the State," *id.*, at 519, the Court held that "a sentence of death cannot be carried out if the jury that imposed or recommended it was chosen by excluding veniremen for cause simply because they voiced general objections to the death penalty," *id.*, at 522. The Court also set forth, in dicta in a footnote, a strict standard for when an individual member of the venire may be removed for cause on account of his or her views on the death penalty. *Id.*, at 522–523, n. 21.

In *Wainwright* v. *Witt*, 469 U. S. 412 (1985), the Court explained that "*Witherspoon* is best understood in the context of its facts." *Id.*, at 418. The Court noted that in *Witherspoon* the trial court had excused half the venire— every juror with conscientious objections to capital punishments. 469 U. S., at 416. Furthermore, the state sentencing scheme under which Witherspoon's sentence was imposed permitted the jury "unlimited discretion in choice of sentence." *Id.*, at 421. When a juror is given unlimited discretion, the Court explained, all he or she must do to follow instructions is consider the death penalty, even if in the end he or she would not be able to impose it. *Ibid.* Rejecting the strict standard found in *Witherspoon*'s footnote 21, the Court recognized that the diminished discretion now given to capital jurors and the State's interest in administering its capital punishment scheme called for a different standard. The Court relied on *Adams* v. *Texas*, 448 U. S. 38, 45 (1980), which provided the following standard: "[W]hether the juror's views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." *Witt*, 469 U. S., at 424 (internal quotation marks omitted).

The Court in *Witt* instructed that, in applying this standard, reviewing courts are to accord deference to the trial court. Deference is owed regardless of whether the trial court engages in explicit analysis regarding substan-

tial impairment; even the granting of a motion to excuse
for cause constitutes an implicit finding of bias. *Id.*, at
430. The judgment as to "whether a veniremen is biased
. . . is based upon determinations of demeanor and credi-
bility that are peculiarly within a trial judge's province.
Such determinations [are] entitled to deference even on
direct review; the respect paid such findings in a habeas
proceeding certainly should be no less." *Id.*, at 428 (inter-
nal quotation marks, footnote, and brackets omitted). And
the finding may be upheld even in the absence of clear
statements from the juror that he or she is impaired be-
cause "many veniremen simply cannot be asked enough
questions to reach the point where their bias has been
made 'unmistakably clear'; these veniremen may not know
how they will react when faced with imposing the death
sentence, or may be unable to articulate, or may wish to
hide their true feelings." *Id.*, at 424–425. Thus, when
there is ambiguity in the prospective juror's statements,
"the trial court, aided as it undoubtedly [is] by its assess-
ment of [the venireman's] demeanor, [is] entitled to re-
solve it in favor of the State." *Id.*, at 434.

The rule of deference was reinforced in *Darden* v.
*Wainwright*, 477 U. S. 168 (1986). There, the State had
challenged a potential juror, and the defense had not
objected to his removal. Without further questioning from
the trial court, the juror was excused. *Id.*, at 178. The
petitioner argued to this Court that the transcript of *voir
dire* did not show that the removed juror was substantially
impaired because the critical answer he had given was
ambiguous. The Court rejected this argument. "[O]ur
inquiry does not end with a mechanical recitation of a
single question and answer." *Id.*, at 176. Even when
"[t]he precise wording of the question asked of [the veni-
reman], and the answer he gave, do not by themselves
compel the conclusion that he could not under any circum-
stance recommend the death penalty," the need to defer to

the trial court remains because so much may turn on a potential juror's demeanor. *Id.*, at 178. The absence of an objection, and the trial court's decision not to engage in further questioning as it had prior to excusing other jurors, supported the conclusion that the juror was impaired. *Ibid.*

In *Gray* v. *Mississippi*, 481 U. S. 648 (1987), the Court addressed once more a case involving not the excusal of a single juror but rather systematic exclusion. The State had lodged for-cause or peremptory challenges against every juror who "expressed any degree of uncertainty in the ability to cast . . . a vote" for the death penalty, *id.*, at 652, and quickly exhausted all 12 of its peremptory challenges, *id.*, at 653. The prosecution then challenged a juror who had expressed no opposition to the death penalty and had said many times that she could return a death sentence. The trial court denied the challenge. *Id.*, at 654–655. Arguing that the trial court had erroneously denied certain earlier challenges for cause, and thus had forced the State to waste peremptory challenges, the prosecution sought to reopen those previous challenges. The trial court refused to do so, but removed the current juror, over objection from the defense. *Id.*, at 655. On appeal all of the state judges agreed the juror could not be excused for cause under either the *Witherspoon* or the *Witt* standard, but the majority held it was appropriate, under the circumstances, to treat the challenge in question as a peremptory strike. 481 U. S., at 656–657.

This Court reversed, holding that the juror had been removed for cause and that she was not substantially impaired under the controlling *Witt* standard. 481 U. S., at 659. The error was not subject to harmlessness review, and thus the sentence could not stand. *Ibid. Gray* represents a rare case, however, because in the typical situation there will be a state-court finding of substantial impairment; in *Gray*, the state courts had found the opposite,

which makes that precedent of limited significance to the instant case.

These precedents establish at least four principles of relevance here. First, a criminal defendant has the right to an impartial jury drawn from a venire that has not been tilted in favor of capital punishment by selective prosecutorial challenges for cause. *Witherspoon*, 391 U. S., at 521. Second, the State has a strong interest in having jurors who are able to apply capital punishment within the framework state law prescribes. *Witt*, 469 U. S., at 416. Third, to balance these interests, a juror who is substantially impaired in his or her ability to impose the death penalty under the state-law framework can be excused for cause; but if the juror is not substantially impaired, removal for cause is impermissible. *Id.*, at 424. Fourth, in determining whether the removal of a potential juror would vindicate the State's interest without violating the defendant's right, the trial court makes a judgment based in part on the demeanor of the juror, a judgment owed deference by reviewing courts. *Id.*, at 424–434.

Deference to the trial court is appropriate because it is in a position to assess the demeanor of the venire, and of the individuals who compose it, a factor of critical importance in assessing the attitude and qualifications of potential jurors. *Id.*, at 428; *Darden*, *supra,* at 178. Leading treatises in the area make much of nonverbal communication. See, *e.g.,* V. Starr & M. McCormick, Jury Selection 389–523 (3d ed. 2001); J. Frederick, Mastering Voir Dire and Jury Selection 39–56 (2d ed. 2005).

The requirements of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), 110 Stat. 1214, of course, provide additional, and binding, directions to accord deference. The provisions of that statute create an independent, high standard to be met before a federal court may issue a writ of habeas corpus to set aside state-court rulings. See 28 U. S. C. §§2254(d)(1)–(2); *Williams* v.

*Taylor*, 529 U. S. 362, 413 (2000).

By not according the required deference, the Court of Appeals failed to respect the limited role of federal habeas relief in this area prescribed by Congress and by our cases.

## II

## A

In applying the principles of *Witherspoon* and *Witt*, it is instructive to consider the entire *voir dire* in Brown's case. Spanning more than two weeks, the process entailed an examination of numerous prospective jurors. After the third day of the *voir dire*, during which few jurors were questioned, the trial court explained the process would "have to go a little bit faster." Tr. 1398. The next day, the court reiterated this concern, for it had told the jury the trial would take no more than six weeks in order not to conflict with the Christmas holidays. *Id.,* at 1426.

Eleven days of the *voir dire* were devoted to determining whether the potential jurors were death qualified. During that phase alone, the defense challenged 18 members of the venire for cause. Despite objections from the State, 11 of those prospective jurors were excused. As for the State, it made 12 challenges for cause; defense counsel objected seven times; and only twice was the juror excused following an objection from the defense. Before deciding a contested challenge, the trial court gave each side a chance to explain its position and recall the potential juror for additional questioning. When issuing its decisions the court gave careful and measured explanations. See, *e.g., id.,* at 2601–2604 (denying the State's motion to excuse a juror following an objection for defense); App. 97–100 (granting the State's motion to excuse Juror X despite an objection from defense).

Before the State challenged Juror Z, the defense moved to excuse a potential juror who had demonstrated some confusion. After argument from both counsel, the trial

court explained that it would be open to further question-
ing if one of the parties felt the juror's position could be
clarified: "I thought at first the both of you were wanting
to excuse [this juror] since he seemed kind of confused to
both sides, but if there really is a question, let me know
and I don't have any hesitation about bringing the juror
out here and following up." *Id.,* at 26. Consistent with the
need for an efficient *voir dire,* the court also told counsel:
"Let me point something out to both sides. If you are
going to agree on a challenge, . . . we can shortcut some of
what happens out here." *Ibid.*

Setting aside the disputed circumstances of Juror Z's
removal, the defense refrained from objecting to the
State's challenges for cause only when the challenged
juror was explicit that he or she would not impose the
death penalty or could not understand the burden of proof.
See Tr. 1457, 1912, 2261, 2940. For other jurors, the
defense objections were vigorous and, it seems, persuasive.
The defense argued that the jurors' equivocal statements
reflected careful thinking and responsibility, not substan-
tial impairment. See, *e.g., id.,* at 1791, 2111, 2815. The
tenacity of Brown's counsel was demonstrated when, long
after the trial court had overruled the defense objection
and excused Juror Y, the defense moved in writing to have
her returned for further questioning and rehabilitation.
*Id.,* at 3151–3154. The trial court denied this motion after
argument from both parties. *Id.,* at 3154.

The defense also lodged its own challenges for cause. In
defending them against the State's objections, defense
counsel argued, contrary to the position Brown takes in
this Court, that a trial court cannot rely upon a potential
juror's bare promises to follow instructions and obey the
law. See, *e.g., id.,* at 1713–1714, 1960–1961, 2772–2773,
3014–3016. With regard to one juror, defense counsel
argued:

"Any time this individual was asked any questions about following the law, he will always indicate that he will. But when we look to see . . . his view[s] on the death penalty, . . . they [are] so strong that they would substantially impair his ability to follow the law and to follow his oath as a juror." *Id.,* at 1960–1961.

In at least two instances this argument appears to have prevailed when the trial court overruled the State's objection to Brown's challenge for cause.

A final, necessary part of this history is the instruction the venire received from the court concerning the sentencing options in the case. Before individual oral examination, the trial court distributed a questionnaire asking jurors to explain their attitudes toward the death penalty. When distributing the questionnaire, the court explained the general structure of the trial and the burden of proof. It described how the penalty phase would function:

"[I]f you found Mr. Brown guilty of the crime of first degree murder with one or more aggravating circumstances, then you would be reconvened for a second phase called a sentencing phase. During that sentencing phase proceeding you could hear additional evidence [and] arguments concerning the penalty to be imposed. You would then be asked to retire to determine whether the death penalty should be imposed or whether the punishment should be life imprisonment without the possibility of parole.

"In making this determination you would be asked the following question: Having in mind the crime with which the defendant has been found guilty, are you convinced beyond a reasonable doubt that there are not sufficient mitigating circumstances to merit leniency? If you unanimously answered yes to this question, the sentence would be death. . . . [Otherwise] the sentence would be life imprisonment with-

out the possibility of release or parole." *Id.,* at. 1089–
1090.

After the questionnaires were filled out, the jurors were
provided with handbooks that explained the trial process
and the sentencing phase in greater depth. Small groups
of potential jurors were then brought in to be questioned.
Before Juror Z's group began, the court explained once
more that if Brown were convicted, "there are only two
penalties that a jury could return, one is life in prison
without possibility of release or parole. And that literally
means exactly that, a true life in prison without release or
parole." *Id.,* at 2016.

  With this background, we turn to Juror Z's examination.

                              B

  Juror Z was examined on the seventh day of the *voir
dire* and the fifth day of the death-qualification phase.
The State argues that Juror Z was impaired not by his
general outlook on the death penalty, but rather by his
position regarding the specific circumstances in which the
death penalty would be appropriate. The transcript of
Juror Z's questioning reveals that, despite the preceding
instructions and information, he had both serious misun-
derstandings about his responsibility as a juror and an
attitude toward capital punishment that could have pre-
vented him from returning a death sentence under the
facts of this case.

  Under the *voir dire* procedures, the prosecution and
defense alternated in commencing the examination. For
Juror Z, the defense went first. When questioned, Juror Z
demonstrated no general opposition to the death penalty
or scruples against its infliction. In fact, he soon ex-
plained that he "believe[d] in the death penalty in severe
situations." App. 58. He elaborated, "I don't think it
should never happen, and I don't think it should happen
10 times a week either." *Id.,* at 63. "[T]here [are] times

when it would be appropriate." *Ibid.*

The questioning soon turned to when that would be so. Juror Z's first example was one in which "the defendant actually came out and said that he actually wanted to die." *Id.,* at 59. Defense set this aside and sought another example. Despite having been told at least twice by the trial court that if convicted of first-degree murder, Brown could not be released from prison, the only example Juror Z could provide was when "a person is . . . incorrigible and would reviolate if released." *Id.,* at 62. The defense counsel replied that there would be no possibility of Brown's release and asked whether the lack of arguments about recidivism during the penalty phase would frustrate Juror Z. He answered, "I'm not sure." *Id.,* at 63.

The State began its examination of Juror Z by noting that his questionnaire indicated he was "in favor of the death penalty if it is proved beyond a shadow of a doubt if a person has killed and would kill again." *Id.,* at 69. The State explained that the burden of proof was beyond a reasonable doubt, not beyond a shadow of a doubt, and asked whether Juror Z understood. He answered, "[I]t would have to be in my mind very obvious that the person would reoffend." *Id.,* at 70. In response the State once more explained to Juror Z, now for at least the fourth time, that there was no possibility of Brown's being released to reoffend. Juror Z explained, "[I]t wasn't until today that I became aware that we had a life without parole in the state of Washington," *id.,* at 71, although in fact a week earlier the trial judge had explained to Juror Z's group that there was no possibility of parole when a defendant was convicted of aggravated first-degree murder. The prosecution then asked, "And now that you know there is such a thing . . . can you think of a time when you would be willing to impose a death penalty . . . ?" *Id.,* at 71–72. Juror Z answered, "I would have to give that some thought." *Id.,* at 72. He supplied no further answer to the

question.

The State sought to probe Juror Z's position further by asking whether he could "consider" the death penalty; Juror Z said he could, including under the general facts of Brown's crimes. *Ibid.* When asked whether he no longer felt it was necessary for the State to show that Brown would reoffend, Juror Z gave this confusing answer: "I do feel that way if parole is an option, without parole as an option. I believe in the death penalty." *Id.,* at 72–73. Finally, when asked whether he could impose the death penalty when there was no possibility of parole, Juror Z answered, "[I]f I was convinced that was the appropriate measure." *Id.,* at 73. Over the course of his questioning, he stated six times that he could consider the death penalty or follow the law, see *id.,* at 62, 70, 72, 73, but these responses were interspersed with more equivocal statements.

The State challenged Juror Z, explaining that he was confused about the conditions under which death could be imposed and seemed to believe it only appropriate when there was a risk of release and recidivism. *Id.,* at 75. Before the trial court could ask Brown for a response, the defense volunteered, "We have no objection." *Ibid.* The court then excused Juror Z. *Ibid.*

### III

On federal habeas review, years after the conclusion of the *voir dire*, the Court of Appeals granted Brown relief and overturned his sentence. The court held that both the state trial court's excusal of Juror Z and the State Supreme Court's affirmance of that ruling were contrary to, or an unreasonable application of, clearly established federal law. 451 F. 3d, at 953. The Court of Appeals held that the Supreme Court of Washington had failed to find that Juror Z was substantially impaired; it further held that the State Supreme Court could not have made that

finding in any event because the transcript unambiguously proved Juror Z was not substantially impaired. For these reasons, explained the Court of Appeals, the trial court's decision to excuse Juror Z was contrary to the *Witherspoon-Witt* rule despite Brown's failure to object. Each of the holdings of the Court of Appeals is wrong.

### A

As part of its exposition and analysis, the Court of Appeals found fault with the opinion of the Supreme Court of Washington. It stated that although the State Supreme Court had held that Jurors X and Y were substantially impaired, the same "finding is missing from the state court's discussion" of Juror Z's excusal. 451 F. 3d, at 950. The Court of Appeals therefore held "[t]he Washington Supreme Court in this case *applied the wrong standard* with respect to Juror Z." *Id.*, at 953, n. 10. This is an erroneous summary of the State Supreme Court's opinion. The state court did make an explicit ruling that Juror Z was impaired. In a portion of the opinion entitled "Summary and Conclusions," the court held: "The trial court properly exercised its discretion in excusing for cause prospective jurors [X, Y, and Z] during *voir dire.* Their views would have prevented or substantially impaired their ability to follow the court's instructions and abide by their oaths as jurors." *Brown,* 132 Wash. 2d, at 630, 940 P. 2d, at 598, 599. It is unclear why the Court of Appeals overlooked or disregarded this finding, and it was mistaken in faulting the completeness of the Supreme Court of Washington's opinion.

Even absent this explicit finding, the Supreme Court of Washington's opinion was not contrary to our cases. The court identified the *Witherspoon-Witt* rule, recognized that our precedents required deference to the trial court, and applied an abuse-of-discretion standard. 132 Wash. 2d, at 601, 940 P. 2d, at 584. Having set forth that framework, it

explained:

> "[Brown] did not object at trial to the State's challenge of [Juror Z] for cause. At any rate, [Juror Z] was properly excused. On *voir dire* he indicated he would impose the death penalty where the defendant 'would reviolate if released,' which is not a correct statement of the law. He also misunderstood the State's burden of proof . . . although he was corrected later. The trial court did not abuse its discretion in excusing [Juror Z] for cause." *Id.,* at 604, 940 P. 2d, at 585.

The only fair reading of the quoted language is that the state court applied the *Witt* standard in assessing the excusal of Juror Z. Regardless, there is no requirement in a case involving the *Witherspoon-Witt* rule that a state appellate court make particular reference to the excusal of each juror. See *Early* v. *Packer*, 537 U. S. 3, 9 (2002) *(per curiam).* It is the trial court's ruling that counts.

B

From our own review of the state trial court's ruling, we conclude the trial court acted well within its discretion in granting the State's motion to excuse Juror Z.

Juror Z's answers, on their face, could have led the trial court to believe that Juror Z would be substantially impaired in his ability to impose the death penalty in the absence of the possibility that Brown would be released and would reoffend. And the trial court, furthermore, is entitled to deference because it had an opportunity to observe the demeanor of Juror Z. We do not know anything about his demeanor, in part because a transcript cannot fully reflect that information but also because the defense did not object to Juror Z's removal. Nevertheless, the State's challenge, Brown's waiver of an objection, and the trial court's excusal of Juror Z support the conclusion that the interested parties present in the courtroom all felt

that removing Juror Z was appropriate under the *Witherspoon-Witt* rule. See *Darden*, 477 U. S., at 178 (emphasizing the defendant's failure to object and the judge's decision not to engage in further questioning as evidence of impairment).

Juror Z's assurances that he would consider imposing the death penalty and would follow the law do not overcome the reasonable inference from his other statements that in fact he would be substantially impaired in this case because there was no possibility of release. His assurances did not require the trial court to deny the State's motion to excuse Juror Z. The defense itself had told the trial court that any juror would make similar guarantees and that they were worth little; instead, defense counsel explained, the court should listen to arguments concerning the substance of the juror's answers. The trial court in part relied, as diligent judges often must, upon both parties' counsel to explain why a challenged juror's problematic beliefs about the death penalty would not rise to the level of substantial impairment. Brown's counsel offered no defense of Juror Z. In light of the deference owed to the trial court the position Brown now maintains does not convince us the decision to excuse Juror Z was unreasonable.

It is true that in order to preserve a *Witherspoon* claim for federal habeas review there is no independent federal requirement that a defendant in state court object to the prosecution's challenge; state procedural rules govern. We nevertheless take into account voluntary acquiescence to, or confirmation of, a juror's removal. By failing to object, the defense did not just deny the conscientious trial judge an opportunity to explain his judgment or correct any error. It also deprived reviewing courts of further factual findings that would have helped to explain the trial court's decision. The harm caused by a defendant's failure to object to a juror's excusal was described well by a Wash-

ington appellate court in a different case:

> "When a challenge for cause is made, opposing counsel can object either on the grounds that it is facially insufficient or that the facts needed to support it are not true.  [Defendant] did neither.  Had [defendant] objected immediately to the State's challenge for cause, the court could have tried the issue and determined the law and facts.  Because [defendant] did not timely object to the excusal of Juror 30, the court had no opportunity to remedy whatever factual questions were in the mind of [defendant's] counsel." *State* v. *Taylor*, No. 16057–2–III etc., 1998 WL 75648, *5 (Wash. App., Feb. 24, 1998) (unpublished opinion; citations omitted).

The defense may have chosen not to object because Juror Z seemed substantially impaired.  See 451 F. 3d, at 959 (Tallman, J., dissenting from denial of rehearing en banc).  Or defense counsel may have felt that Juror Z, a basketball referee whose stepbrother was a police officer, would have been favorable to the State.  See App. 68, 74; 451 F. 3d, at 953, n. 9 (reasoning that "defense counsel declined to object because he was glad to get rid of juror Z. After all, Z had described himself as pro-death penalty . . . .  Defense counsel must have thanked his lucky stars when the prosecutor bumped Z").  Or the failure to object may have been an attempt to introduce an error into the trial because the defense realized Brown's crimes were horrific and the mitigating evidence was weak.  Although we do not hold that, because the defense may have wanted Juror Z on the jury, any error was harmless, neither must we treat the defense's acquiescence in Juror Z's removal as inconsequential.

The defense's volunteered comment that there was no objection is especially significant because of frequent defense objections to the excusal of other jurors and the

trial court's request that if both parties wanted a juror removed, saying so would expedite the process. In that context the statement was not only a failure to object but also an invitation to remove Juror Z.

We reject the conclusion of the Court of Appeals that the excusal of Juror Z entitles Brown to federal habeas relief. The need to defer to the trial court's ability to perceive jurors' demeanor does not foreclose the possibility that a reviewing court may reverse the trial court's decision where the record discloses no basis for a finding of substantial impairment. But where, as here, there is lengthy questioning of a prospective juror and the trial court has supervised a diligent and thoughtful *voir dire*, the trial court has broad discretion. The record does not show the trial court exceeded this discretion in excusing Juror Z; indeed the transcript shows considerable confusion on the part of the juror, amounting to substantial impairment. The Supreme Court of Washington recognized the deference owed to the trial court and, contrary to the Court of Appeals' misreading of the state court's opinion, identified the correct standard required by federal law and found it satisfied. That decision, like the trial court's, was not contrary to, or an unreasonable application of, clearly established federal law.

## IV

Brown raises two additional arguments that rely upon Washington state law. He first contends we should not consider his failure to object because Washington state law does not require a defendant to object to a challenge to a potential juror. See Tr. of Oral Arg. 35 ("As to the . . . failure to object . . . we have admitted that what [defense counsel] said was I have no objection. . . . But [they] all knew that this issue could be raised for the first time on appeal"). In addition he asserts that even if Juror Z's statements indicated that he would base his decision upon

the risk of Brown reoffending, that requirement was consistent with the state sentencing scheme.

For the reasons explained above the defense's failure to object in this case has significance to our analysis even on the assumption that state law did not require an objection to preserve an error for review in the circumstances of this case. The Supreme Court of Washington, however, noted Brown's failure to object, suggesting it had significance for its own analysis. *Brown*, 132 Wash. 2d, at 604, 940 P. 2d, at 585. This is consistent with Washington law, which permits a party to "except" to the opposing party's challenge of a juror for cause, Wash. Rev. Code 4.44.230 (2006), and gives appellate courts discretion to bar "any claim of error which was not raised in the trial court" unless that error is a "manifest error affecting a constitutional right," Wash. Rule App. Proc. 2.5(a) (2006). See also 13 R. Ferguson, Washington Practice: Criminal Practice and Procedure §4908, p. 432 (3d ed. 2004) ("In general, issues not raised in the trial court will not be considered for the first time on appeal. It is the purpose of this general rule to give the trial court an opportunity to correct the alleged error. Accordingly, it is the duty of counsel to call the trial court's attention to the alleged error . . ." (footnotes omitted)).

The Supreme Court of Washington also held that Juror Z misstated Washington's sentencing law. *Brown, supra,* at 604, 940 P. 2d, at 585. It is not for us to second-guess that determination, and our conclusion is, in any event, the same as that court's. Juror Z did not say that the likelihood of Brown's harming someone while in prison would be among his sentencing considerations. Rather, the sole reason Juror Z expressed for imposing the death penalty, in a case where the accused opposed it, was whether the defendant could be released and would reviolate. That is equivalent to treating the risk of recidivism as the sole aggravating factor, rather than treating lack of

future dangerousness as a possible mitigating considera-tion. See Wash. Rev. Code §10.95.020 (2006) (setting forth aggravating factors); §10.95.070 (setting forth future dangerousness as one of eight mitigating factors).

For these reasons, we are not persuaded to depart from the Supreme Court of Washington's determination of the state law at issue or to ignore Brown's failure to object.

\*     \*     \*

Capital defendants have the right to be sentenced by an impartial jury. The State may not infringe this right by eliminating from the venire those whose scruples against the death penalty would not substantially impair the performance of their duties. Courts reviewing claims of *Witherspoon-Witt* error, however, especially federal courts considering habeas petitions, owe deference to the trial court, which is in a superior position to determine the demeanor and qualifications of a potential juror. The Court of Appeals neglected to accord this deference. And on this record it was error to find that Juror Z was not substantially impaired. The judgment of the Court of Appeals is reversed, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

## APPENDIX TO OPINION OF THE COURT

Excerpts of Verbatim Report of Proceedings *(Voir Dire)* (Nov. 3, 1993) in *State* v. *Brown*, Cause No. 91–1–03233–1 (Super. Ct. King Cty., Wash.), App. 57–75:

THE COURT: All right. [Juror Z]. (Prospective Juror, [Juror Z], entered the courtroom.)

THE COURT: That's fine, [Juror Z]. Good afternoon.

[JUROR Z]: Good afternoon.

THE COURT: Do you have any questions at all about any of the preliminary instructions that you got this afternoon and the format that we were talking about or the reasons why the attorneys have to discuss the penalty phase when there may never really be a penalty phase.

[JUROR Z]: No, I think I understand the situation.

THE COURT: Did you answer or nod your head about remembering something about having heard this crime before?

[JUROR Z]: No, I did not.

THE COURT: Okay. We'll start with the defense.

MS. HUPP: Thank you, your Honor.

### VOIR DIRE EXAMINATION

BY MS. HUPP:

Q Good afternoon. My name is Lin-Marie Hupp, and I'm one of Cal Brown's attorneys.

I would like to start off asking you some questions about your feelings about the death penalty. I want to reinforce what the Judge has already told you, which is there are no right or wrong answers. We just need to get information about your feelings so we can do our job.

A Okay.

Q Can you tell me when it was you first realized this was a potential death penalty case?

A Not until last Monday when I was here in the initial

jury information session.

Q Okay. Can you tell me when the Judge read that long thing to you and basically told you that this was a potential in the case, can you tell me what you were thinking when you heard that?

A I guess I wasn't surprised when I got the announcement for jury duty. And it was more than the standard two weeks that most everybody else goes to. I thought it must be a pretty substantial case. In my mind I tried to guess what it might be, so this is one of the things that entered into it.

Q Can you give me an idea of what your general feelings about the death penalty are?

A I do believe in the death penalty in severe situations. A good example might be the young man from, I believe he was from Renton that killed a couple of boys down in the Vancouver area and was sentenced to the death penalty, and wanted the death penalty. And I think it is appropriate in severe cases.

Q And that case you're talking about, that is the one where he actually came out, the defendant actually came out and said that he actually wanted to die?

A I believe that was the case.

Q Does that have any kind of bearing on your idea that the death penalty was appropriate in his case?

A I believe that it was in that case.

Q If you removed that factor completely from it, is that again the type of case that you think the death penalty would be appropriate?

A It would have to be a severe case. I guess I can't put a real line where that might be, but there are a lot of cases that I don't think it's where people would—

Q Okay. And let me kind of fill in the blanks for myself here by just asking you a couple of questions about that. I'm assuming that there would not be any case other than murder that you would think the death penalty would be

appropriate?

A  I think that is correct.

Q  Okay.  And the way the law is in Washington any-
way, in order to get to the point where you would even
consider the death penalty, the State would first have to
prove that you had committed a premeditate murder and
one that had been thought about beforehand.

Do you have any kind of feeling that something other
than a premeditated murder, in other words, one that
would have been planned that would be appropriate for
the death penalty?

A  No.  I think it would have to be premeditated.

Q  In addition to that in Washington even premeditated
murders are not eligible for a potential death penalty
unless the State also proves aggravating circumstances.
In this case the State is alleging or is going to try and
prove a number of aggravating circumstances, four of
them.  Okay.  And the ones that they are going to try and
prove are that the murder was committed, a premeditated
murder was committed during a rape, a robbery, a kid-
napping and that it was done in order to conceal a witness
or eliminate a witness.

Does that fall within the class of cases that you think
the death penalty is appropriate?

A  I think that would be.

Q  Okay.  Now, how about other sentencing options in a
case like that, do you think that something other than the
death penalty might be an appropriate sentence?

A  I think that if a person is temporarily insane or
things of that that lead a person to do things that they
would not normally do, I think that would enter into it.

Q  All right.  Other than—well, maybe what we should
do—the way that the law is in Washington, if the jury
finds beyond a reasonable doubt that somebody has com-
mitted a premeditated murder with at least one aggravat-
ing circumstance, and in this case you have a potential for

the four, then the jury reconvenes to consider whether or not the death penalty should be imposed or whether or not a life sentence without parole should be imposed.

One sort of aside here, life without parole is exactly what it sounds like. It is a life sentence. You're not ever eligible for parole. You hear about it in the papers sometimes where somebody has got a life sentence and they're going to be eligible for parole in 10 years or 20 years.

A I understand.

Q Were you aware before that Washington has got this kind of sentence where it's life without parole where you are not ever eligible for parole?

A I did not until this afternoon.

Q That is the two options that the jury has if they found the person guilty of premeditated murder beyond a reasonable doubt plus aggravating circumstances beyond a reasonable doubt.

Do you think that you could consider both options?

A Yes, I could.

Q Could you give me an idea sort of have you thought about sort of the underlying reason why you think the death penalty is appropriate, what purpose it serves, that kind of thing?

A I think if a person is, would be incorrigible and would reviolate if released, I think that's the type of situation that would be appropriate.

Q Okay. Now, knowing that you didn't know before when you were coming to those opinions about the two options that we have here obviously somebody who is not going to get out of jail no matter which sentence you give them if you got to that point of making a decision about the sentence, does that mean what I'm hearing you say is that you could consider either alternative?

A I believe so, yes.

Q Now, in your, I think in your questionnaire you sort of referred to that also, what you kind of thought about

was if somebody had been killed and it had been proven to you that they would kill again.  Understanding that the two options there are life without parole or the death penalty, there is not a lot of likelihood that people are going to spend a lot of time talking about whether or not they're going to kill again in the sentencing phase of this case.  Is that going to make you frustrated? Are you going to want to hear about things like that, about people's opinions in the penalty phase?

A  I'm not sure.

Q  Okay.  That's very fair.  Do you have any kind of feelings about the frequency of the use of the death penalty in the United States today?  Do you think it's used too frequently or not often enough?

A  It seemed like there were several years when it wasn't used at all and just recently it has become more prevalent in the news anyway.  I don't think it should never happen, and I don't think it should happen 10 times a week either.  I'm not sure what the appropriate number is but I think in severe situations, it is appropriate.

Q  It sounds like you're a little more confortable that it is being used some of the time?

A  Yes.

Q  You weren't happy with the time when it wasn't being used at all?

A  I can't say I was happy or unhappy, I just felt that there were times when it would be appropriate.

Q  Let me ask you, and we may have covered this already, but let me ask you just to make sure I understand.  If the State were to prove beyond a reasonable doubt that the defendant had committed a premeditated murder with aggravating circumstances that I have laid out for you, rape, robbery, kidnapping, to conceal or eliminate a witness, at least one of those, in addition another thing you might hear in this trial is some evidence that the defendant deliberately inflicted pain upon the victim before she

Appendix to opinion of the Court

died for some period of time.

If that was the crime that you heard about and came to a decision about guilty about, do you think you consider a life sentence?

A  I could consider it but I don't know if I really have enough information to make a determination.

Q  Right.  And it's real tough to be asking you these questions and even tougher for you to have to answer them without any evidence before you.  But you understand that this is our only time to do that before you have heard all the evidence?

A  I understand, yes.

Q  As a matter of fact, the law in this state after, even after you have found somebody guilty of really hideous crime like that presumes that the sentence, the appropriate sentence is life without parole.  The State has the burden of proof, again, in the penalty phase.  And they would have to prove beyond a reasonable doubt that there are not sufficient mitigating circumstances to merit a life sentence.

Are you comfortable with that idea that you start off presuming that, as a matter of fact, even for a hideous crime that a life sentence is the appropriate sentence?

A  It is or is not?

Q  That it is an appropriate sentence.

A  I guess I'm a little confused by the question.  So, you go into it with a life sentence is the appropriate sentence?

Q  Right.  If you look at the chart here, there's almost a mirror image to start off a trial presuming that somebody is innocent and you start off a sentencing presuming that a life sentence is appropriate?

A  I see.

Q  Okay.

A  Yes.

Q  Okay.  Now, as far as mitigating circumstances, you had mentioned the idea that maybe somebody was tempo-

rarily insane. The Judge is going to give you an instruc-tion on mitigating circumstances, and I will defines it for you, but the definition is real broad. The definition basi-cally is, any reason, not a justification, not an excuse for the crime and not a defense to the crime, but a reason for imposing something other than death. That's pretty broad.

MR. MATTHEWS: I object to that question. I don't believe that is a question. I believe that's a statement.

THE COURT: The objection will be sustained.

Q (BY MS. HUPP) The judge will instruct you about what a mitigating circumstance is.

But what I want to be real clear about is that it's not a defense to the crime. Okay. In other words, if you believe that somebody was really temporarily insane at the time he committed the offense, well, then it wouldn't be pre-meditated. It would be an insanity defense, and that would all get dealt with—

MR. MATTHEWS: Your Honor, again, I am going to object to the nature of the question.

THE COURT: [Juror Z], you were the one that actually brought it up in terms of the mental status of the person. You are the one who said temporarily insane when they committed this kind of crime. You realize that there are particular defenses that may be available in the actual criminal case itself, the guilt phase.

But once you get to the penalty phase, we're not talking about the crime in any way, and you're simply trying to determine what the appropriate punishment or sanction should be for a crime that a person has been found guilty of. At that point in time, something like all sorts of miti-gating circumstances come into it, and mental status can come into it. But it would only be evaluated in the light of the mitigating circumstances, not a defense. Do you un-derstand that?

A Understand.

Q (BY MS. HUPP) To just sort of follow up on that, if

mental status came into play and you were presented with some sort of evidence about mental status, is that the sort of evidence you would consider?

A  Yes, I could.

Q  How about things like somebody's childhood or their emotional development?

A  I could consider it.  I don't have strong feelings one way or the other.

Q  Okay.  All right.  And, also, when we talk about mitigating circumstances, what might be mitigating to you might not matter much to the person sitting next to you in juror's box.  Do you think you could discuss your feelings about those things?

A  Yes.

Q  Could you, say the person next to you says something is mitigating and you don't think it's very mitigating at all, could you also discuss it in this situation?

A  (Nodding head).

Q  Could you respect that other person's opinion?

A  Everybody is entitled to an opinion, yes.

Q  Another thing that happens at the sentencing phase of the trial is that the jury would have to be unanimous, in other words, everybody would have to agree if they were going to impose a death sentence.  If one person, four people, five people, how ever many people don't agree with that, then the sentence is life.  Okay.  So, it kind of strips away that sort of comfort in numbers that some people get from the idea of having a unanimous decision.

Do you think you can accept the responsibility for such an important decision for yourself?

A  I do.

Q  Okay.  Thank you.

MS. HUPP:  I have no further questions.

THE COURT:  The State.

VOIR DIRE EXAMINATION

BY MR. MATTHEWS:

Q  [Juror Z], I'm Al Matthews.  I'm one of two prosecutors in the case.  I have got some very specific questions, and perhaps we can clear them up real rapidly.

I see your step-brother is a policeman and you see him about four times a year.

A  (Nodding head).

Q  Do you ever have any discussions about the death penalty, is this a subject that ever comes up?

A  No.

Q  Have you ever had occasion to discuss it at all within the family circle?

A  I don't believe so.

Q  You mentioned on your questionnaire, and we do read them, that you're in favor of the death penalty if it is proved beyond a shadow of a doubt if a person has killed and would kill again.  Do you remember making that statement?

A  Yes.

Q  First of all, have you ever been on a jury trial before?

A  I have not.

Q  Now, you made this statement before you read your juror's handbook I imagine?

A  Yes.

Q  So, I want to ask you, the thing that bothers me, of course, is the idea beyond a shadow of a doubt.  The law says beyond a reasonable doubt, and it will be explained to you what it actually means.  But I want to assure you it doesn't mean, I don't believe the Court would instruct would you it means beyond all doubt or beyond any shadow of a doubt.  Knowing that, would you still require the State to prove beyond a shadow of a doubt that the crime occurred knowing that the law doesn't require that much of us?

A  I would have to know the, I'm at a loss for the words

Appendix to opinion of the Court

here.

Q You can ask me any questions, too, if you need some clarification.

A I guess it would have to be in my mind very obvious that the person would reoffend.

Q Well, we're not talking about that, sir.

A Or was guilty, yes.

Q So, we're talking about that?

A Yes.

Q So, you would be satisfied with a reasonable doubt standard? You would be willing to follow the law?

A Yes.

Q In other words, nothing, there is very few things in life absolutely certain?

A I understand.

Q And that is basically what we're saying to you, and that is what the term reasonable doubt means—

A (Nodding head).

Q —that we don't have to prove it beyond all doubt.

Now, we get to the penalty phase and the question becomes slightly different. It presumes life as a person is presumed innocent in the guilt phase, it is presumed that the proper penalty for the beginning point in the penalty phase is life in prison without parole.

Now, you mentioned that you would have to be satisfied that the person would not kill again. Now, you know that the possible, that the only two penalties are life in prison without parole or death. The person, if he is committed, if he is convicted of aggravated murder, is not going to be out on the streets again, not going to come in contact with the people that he had a chance to run into before. So, the likelihood of him killing someone out in the street is nil or practically nil at that point.

I guess the reverse side of what you're saying is, if you could be convinced that he wouldn't kill again, would you find it difficult to vote for the death penalty given a situa-

tion where he couldn't kill again?

A  I think I made that statement more under assumption that a person could be paroled.  And it wasn't until today that I became aware that we had a life without parole in the state of Washington.

Q  And now that you know there is such a thing and they do mean what they say, can you think of a time when you would be willing to impose a death penalty since the person would be locked up for the rest of his life?

A  I would have to give that some thought.  I really, like I said, up until an hour ago did not realize that there was an option of life without parole.

Q  And I realize this is put on you rather suddenly, but you also recognize as someone who is representing the State in this case, we have made the election to ask that the jury if he is found guilty, ask that the jury vote for the death penalty.

And I'm asking you a very important thing and to everyone in here, whether you, knowing that the person would never get out for the rest of his life, two things.  And they're slightly different.  One, whether you could consider the death penalty and the second thing I would ask you is whether you could impose the death penalty.  I'm not asking a promise or anything.

But I'm asking you, first, could you consider it, and if you could consider it, do you think under the conditions where the man would never get out again you could impose it?

A  Yes, sir.

Q  So, this idea of him having to kill again to deserve the death penalty is something that you are not firm on, you don't feel that now?

A  I do feel that way if parole is an option, without parole as an option.  I believe in the death penalty.  Like I said, I'm not sure that there should be a waiting line of people happening every day or every week even, but I

think in severe situations it's an appropriate measure.

Q  But in the situation where a person is locked up for the rest of his life and there is no chance of him ever getting out again, which would be the situation in this case, do you think you could also consider and vote for the death penalty under those circumstances?

A  I could consider it, yes.

Q  Then could you impose it?

A  I could if I was convinced that was the appropriate measure.

MR. MATTHEWS: I have no further questions.

THE COURT: All right.  [Juror Z], there is something that I want to clarify in response to some of the questions that were asked of you.

## VOIR DIRE EXAMINATION

BY THE COURT:

Q  In your questionnaire it talks about beyond a shadow of a doubt, and the prosecutor here went into that a little further.  You realize that that is the standard that the law imposes on the State to prove a case beyond a reasonable doubt.  And, obviously, that is a question of interpretation.

You officiate basketball games.  That's in your questionnaire.  You, even at the college level, knowing how fast that game is, you have to make a call on some of those calls and you have to decide whether to blow that whistle and make that particular call.  Do you think you understand the difference between a reasonable call and beyond a shadow of a doubt type call?

A  I guess I do.  The terminology beyond a shadow of a doubt, when I wrote that I wasn't even sure whether, I mean, it's just terminology that I have heard probably watching Perry Mason or something over the years.  But I guess the point I was making that it has to be—

Q  You would have to be positive?

A  I would have to be positive, that's correct.

Q  The State has to convince you?

A  Yes.

Q  As they would have to convince any reasonable person?

A  Yes.

THE COURT: [Juror Z], let me have you step back into the juryroom.  The bailiff will excuse you from there in just a few minutes.  Thank you.

Counsel, any challenge to this particular juror?

MR. MATTHEWS: I would, your Honor, not on the term beyond a shadow of a doubt, I think he would certainly stick with the reasonable doubt standard.  But I think he is very confused about the statements where he said that if a person can't kill again, in other words, he's locked up for the rest of his life, he said, basically, he could vote for the death penalty if it was proved beyond a shadow of.  And I am certainly going to concede that he means beyond a reasonable doubt.  And if a person kills and will kill again.  And I think he has some real problems with that.  He said he hadn't really thought about it.  And I don't think at this period of time he's had an opportunity to think about it, and I don't think he said anything that overcame this idea of he must kill again before he imposed the death penalty or be in a position to kill again.  So, that is my only challenge.

MR. MULLIGAN: We have no objection.

THE COURT: Counsel, the request of the prosecutor's office, we will go ahead and excuse [Juror Z].

# SUPREME COURT OF THE UNITED STATES

─────────────

No. 06–413

─────────────

## JEFFREY UTTECHT, SUPERINTENDENT, WASH-INGTON STATE PENITENTIARY, PETITIONER *v.* CAL COBURN BROWN

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

[June 4, 2007]

JUSTICE STEVENS, with whom JUSTICE SOUTER, JUSTICE GINSBURG, and JUSTICE BREYER join, dissenting.

Millions of Americans oppose the death penalty. A cross section of virtually every community in the country includes citizens who firmly believe the death penalty is unjust but who nevertheless are qualified to serve as jurors in capital cases. An individual's opinion that a life sentence without the possibility of parole is the severest sentence that should be imposed in all but the most heinous cases does not even arguably "'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.'" *Wainwright* v. *Witt,* 469 U. S. 412, 420 (1985) (emphasis deleted). Moreover, an individual who maintains such a position, or even one who opposes the death penalty as a general matter, "'may not be challenged for cause based on his views about capital punishment.'" *Ibid.* Today the Court ignores these well-established principles, choosing instead to defer blindly to a state court's erroneous characterization of a juror's *voir dire* testimony.[1] Although this

─────────────

[1] The Court opens its opinion with a graphic description of the underlying facts of respondent's crime, perhaps in an attempt to startle the reader or muster moral support for its decision. Given the legal question at issue, and the procedural posture of this case, the inclusion of

case comes to us under the standard of review imposed by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), 110 Stat. 1214, the level of deference given by the Court to the state courts in this case is completely unwarranted based on the record before us. Because I find no justification in the record or elsewhere for the decision to strike Juror Z for cause, I must dissent.

I

When the State challenged Juror Z, it argued that he was "confused about the conditions under which [the death penalty] could be imposed and seemed to believe it only appropriate when there was a risk of release and recidivism." *Ante*, at 12. A more accurate characterization of Juror Z's testimony is that although he harbored some general reservations about the death penalty, he stated that he could consider and would vote to impose the death penalty where appropriate.[2] When asked for "an

––––––––––

such a description is, in my view, both irrelevant and unnecessary. Cf. *Witt*, 469 U. S., at 440, n. 1 (Brennan, J., dissenting) ("However heinous Witt's crime, the majority's vivid portrait of its gruesome details has no bearing on the issue before us. It is not for this Court to decide whether Witt deserves to die. That decision must first be made by a jury of his peers, so long as the jury is impartial and drawn from a fair cross section of the community in conformity with the requirements of the Sixth and Fourteenth Amendments").

[2] In contrast to Juror Z's statements, those jurors who have been properly struck under the *Witherspoon-Witt* rule have made much stronger statements with regard to their inability to follow the law or to impose the death penalty. See, *e.g.*, *Wainwright* v. *Witt*, 469 U. S. 412, 416 (1985) (juror confirming that her personal beliefs would interfere with her ability to judge the guilt or innocence of the defendant); *id.*, at 438, n. 7 (STEVENS, J., concurring in judgment) (discussing the two other jurors who were properly dismissed for cause, one of whom stated that he would not be able to "'follow the law as instructed by the Court'" when the death penalty was in issue, and the other of whom stated that he could not "keep an open mind as to whether to vote for the death penalty or life"). Cf. *Gray* v. *Mississippi*, 481 U. S. 648, 653–654, and n. 5, 659 (1987) (holding that a juror who seemed "somewhat

idea . . . of the underlying reason why you think the death penalty is appropriate [or] what purpose it serves," Juror Z responded that "the *type* of situation" in which the death penalty would be appropriate was "if a person was incorrigible and would reviolate if released." App. 62 (emphasis added). After it was explained to Juror Z that the only two sentencing alternatives available under Washington law would be life imprisonment without the possibility of parole and a death sentence, Juror Z repeatedly confirmed that even if he knew the defendant would never be released, he would still be able to consider and vote for the death penalty. *Id.,* at 62, 72, 73. As for any general reservations Juror Z may have had about the imposition of the death penalty, it is clear from his testimony that he was in no way categorically opposed to it. When asked whether he was "a little more comfortable that it is being used some of the time," Juror Z responded in the affirmative. *Id.,* at 63.

While such testimony might justify a prosecutor's peremptory challenge, until today not one of the many cases decided in the wake of *Witherspoon* v. *Illinois,* 391 U. S. 510 (1968), has suggested that such a view would support a challenge for cause. The distinction that our cases require trial judges to draw is not between jurors who are in favor of the death penalty and those who oppose it, but rather between two sub-classes within the latter class— those who will conscientiously apply the law and those whose conscientious scruples necessarily prevent them from doing so.[3] As then-Justice Rehnquist explained in

———————

confused" but who stated that she "could" vote for the death penalty "'was clearly qualified to be seated as a juror under the *Adams* [v. *Texas*, 448 U. S. 38 (1980)] and *Witt* criteria'").

[3] "The state of this case law leaves trial courts with the difficult task of distinguishing between prospective jurors whose opposition to capital punishment will not allow them to apply the law or view the facts impartially and jurors who, though opposed to capital punishment, will

his opinion for the Court in *Lockhart* v. *McCree*, 476 U. S. 162, 176 (1986):

> "It is important to remember that not all who oppose the death penalty are subject to removal for cause in capital cases; those who firmly believe that the death penalty is unjust may nevertheless serve as jurors in capital cases so long as they state clearly that they are willing to temporarily set aside their own beliefs in deference to the rule of law."

Today's opinion simply ignores the justification for this strict rule. As we explained 20 years ago:

> "The State's power to exclude for cause jurors from capital juries does not extend beyond its interest in removing those jurors who would 'frustrate the State's legitimate interest in administering constitutional capital sentencing schemes by not following their oaths.' *Wainwright* v. *Witt*, 469 U. S., at 423. To permit the exclusion for cause of other prospective jurors based on their views of the death penalty unnecessarily narrows the cross section of venire members. It 'stack[s] the deck against the petitioner. To execute [such a] death sentence would deprive him of his life without due process of law.' *Witherspoon* v. *Illinois*, 391 U. S., at 523." *Gray* v. *Mississippi,* 481 U. S. 648, 658–659 (1987).

In its opinion, the Court blindly accepts the state court's conclusory statement that Juror Z's views would have "substantially impaired" his ability to follow the court's instructions without examining what that term means in practice and under our precedents. *Ante,* at 13. Even AEDPA does not permit us to abdicate our judicial role in

---

nevertheless conscientiously apply the law to the facts adduced at trial." *Witt*, 469 U. S., at 421.

this fashion.

The high threshold that must be crossed to establish the kind of impairment that would justify the exclusion of a juror under the rule of *Wainwright* v. *Witt* is illustrated by Justice Powell's opinion for the Court in *Darden* v. *Wainwright*, 477 U. S. 168 (1986). In that case, we assumed that a prospective juror's affirmative answer to the following question would not suffice to support his exclusion for cause: "'Do you have any moral or religious, conscientious moral or religious principles in opposition to the death penalty so strong that you would be unable without violating your own principles to vote to recommend a death penalty regardless of the facts?'" *Id.,* at 178. We recognized that the juror's answer by itself did not compel the conclusion that he could not under any circumstances recommend the death penalty. See *ibid.* ("The precise wording of the question asked of [the juror], and the answer he gave, do not by themselves compel the conclusion that he could not under any circumstance recommend the death penalty"). We nevertheless upheld his exclusion because the trial judge had previously explained that he wanted to know if "'you have such strong religious, moral or conscientious principles in opposition to the death penalty that you would be unwilling to vote to return an advisory sentence recommending the death sentence *even though the facts presented to you should be such as under the law would require that recommendation?'" Id.*, at 176 (emphasis added). Our holding in *Darden* rested squarely on the distinction between mere opposition to the death penalty—even when based on religious or moral principles—and an inability to perform the legally required duties of a juror.

In contrast, in *Gray*, 481 U. S. 648, we reversed a death sentence where a juror had been impermissibly struck for cause. In that case, the trial court struck a juror who appeared confused and who at times seemed to equivocate,

but who eventually acknowledged that "she could consider
the death penalty in an appropriate case." *Id.*, at 653; cf.
*voir dire* testimony of Juror Z, App. 73 ("I could [impose
the death penalty] if I was convinced that it was the ap-
propriate measure"). The Court distinguishes *Gray* from
the case now before us solely on the basis that in *Gray*
there was no state-court finding of substantial impair-
ment. *Ante*, at 5–6. In the Court's view, this distinction is
grounded in the fact that, here, there was "an explicit
ruling that Juror Z was impaired." *Ante,* at 13. That
"ruling" consists of a one-sentence conclusion included in
the final summary section of the Washington Supreme
Court's opinion. That conclusion is based on an earlier
part of the court's opinion, in which it found that during
*voir dire*, Juror Z "indicated that he would impose the
death penalty where the defendant 'would reviolate if
released,' which is not a correct statement of the law."
*State* v. *Brown*, 132 Wash. 2d 529, 604, 940 P. 2d 546, 585
(1997) (en banc). Under our precedents, a juror's state-
ment that he would vote to impose a death sentence where
there is a possibility that the defendant may reoffend,
provided merely as an example of when that penalty
might be appropriate, does not constitute a basis for strik-
ing a juror for cause.[4]

   In the alternative, and perhaps recognizing the tenuous
nature of the state court's "ruling," the Court relies on the
fact that the trial court's judgment is entitled to deference

---

[4] To the extent the Washington Supreme Court deemed Juror Z "sub-
stantially impaired" because he initially demonstrated a misunder-
standing of or confusion about the relevant law, that would also be an
insufficient basis to support his exclusion for cause, given that by the
end of the *voir dire* questioning, his confusion on that point had abated
and he had made clear that even if the defendant were never to be
released, he could still consider the death penalty. He also initially
"misunderstood the State's burden of proof in a criminal case" but, as
the Washington Supreme Court itself explained, "he was corrected
later." 132 Wash. 2d, at 604, 940 P. 2d, at 585.

because it had the unique opportunity to observe Juror Z's demeanor during *voir dire*. A ruling cannot be taken at face value when it is clear that the reasoning behind that ruling is erroneous in light of our prior precedents.[5] There is absolutely nothing in the record to suggest—even in light of the trial court's tendency to provide "careful and measured explanations" for its decisions, *ante*, at 7—that anything about Juror Z's demeanor would dull the impact of his numerous affirmative statements about his ability to impose the death penalty in any situation. In effect, the Court reads something into nothing and defers to a finding that the trial court never made, instead of relying on the finding on which the Washington Supreme Court clearly based its own ruling and which finds no support in our decisions.

In its analysis, the Court places great emphasis on defense counsel's failure to object to Juror Z's exclusion for cause, characterizing it as "voluntary acquiescence to, or confirmation of" his removal. *Ante*, at 15. A closer look at the *voir dire* transcript, which the Court has included as an appendix to its opinion, reveals that the Court's interpretation of defense counsel's statement is not necessarily accurate. Upon being asked by the judge if either party had any challenge to Juror Z, the State provided that it did and the defense responded to the judge that it had "no objection." App. 75. Although the Court reads defense counsel's statement to mean that defense counsel had no objection to Juror Z's exclusion, it is more clearly read to

---

[5] Although pre-AEDPA, we recognized in *Gray* that the deference traditionally given to a trial court's findings may not be due when those findings are based on a misapplication of federal law. See 481 U. S., at 661, n. 10 ("The State has devoted a significant portion of its brief to an argument based on the deference this Court owes to findings of fact made by a trial court. Such deference is inappropriate where, as here, the trial court's findings are dependent on an apparent misapplication of federal law").

mean that the defense had no objection to Juror Z serving on the jury and therefore no reason to challenge him.[6]

Even if we were to interpret defense counsel's statement as the failure to provide an affirmative "defense of Juror Z," *ante*, at 15, it is important to recognize that Washington law does not require an objection to preserve an error for review.[7] *Ante*, at 17; see also *State* v. *Levy*, 156 Wash. 2d 709, 719, 132 P. 3d 1076, 1081 (2006) ("We have long held that even if the defendant fails to object at trial, error may be raised on appeal if it 'invades a fundamental right of the accused'" (quoting *State* v. *Becker*, 132 Wash. 2d 54, 64, 935 P. 2d 1321, 1326 (1997)).

In any event, whether defense counsel's statement is taken as a failure to provide a defense of Juror Z or as acquiescence in his recusal, it is irrelevant to the ultimate disposition of this case. We said in *Witt* that the failure to object "in a situation later claimed to be so rife with ambiguity as to constitute constitutional error" is a factor that should be considered when assessing a defendant's claims, 469 U. S., at 431, n. 11, but in this case there was absolutely no basis for striking Juror Z. Thus, counsel's failure to provide an affirmative response to the State's motion,

———————

[6]As the Court of Appeals recognized in its opinion, it could also certainly be the case that "defense counsel declined to object because he was glad to get rid of juror Z[, given that] Z had described himself as pro-death penalty, and reiterated numerous times, under oath, that he would be willing and able to impose the death penalty." *Brown* v. *Lambert*, 451 F. 3d 946, 953, n. 9 (CA9 2005); cf. *Witt*, 469 U. S., at 437 (STEVENS, J., concurring in judgment) (noting that in the case of one juror who stated unequivocally that she "'could not bring back a death penalty,'" the defense's objection to the prosecutor's motion to excuse her for cause served to demonstrate that defense counsel *wanted* the juror to remain on the jury).

[7]In contrast, in *Witt*, we found it significant enough to note that since it had decided the case, the Florida Supreme Court had "enforced a contemporaneous-objection rule when dealing with *Witherspoon* challenges." *Id.,* at 431, n. 11.

though perhaps not strategically sound, does not doom respondent's constitutional claim. Unlike *Witt*, in which there was arguably some ambiguity in the juror's *voir dire* responses, here Juror Z had unambiguously asserted his full capability to follow the law. See, *e.g.*, App. 58 ("I do believe in the death penalty in severe situations"); *id.*, at 62 (responding to whether he could consider both available sentencing options, "Yes, I could"); *id.*, at 63 ("I just felt that there were times when [the death penalty] would be appropriate"); *id.*, at 72 (responding to whether he could consider and impose the death penalty where the defendant would otherwise never be released from prison, "Yes, sir"); *id.*, at 73 (responding to whether he could consider and vote for the death penalty where the alternative is a life sentence without the possibility of parole, "I could [impose it] if I was convinced that was the appropriate measure"); cf. *Witt*, 469 U. S*.,* at 438 (STEVENS, J., concurring in judgment) ("Given . . . [the juror's] somewhat timorous responses, it is entirely possible that her appearance and demeanor persuaded trial counsel that he would prefer a vigorous or more reluctant juror").

## II

Even a juror who is generally opposed to the death penalty cannot permissibly be excused for cause so long as he can still follow the law as properly instructed. The Court recognizes this principle, see *ante*, at 2–3, and yet the perverse result of its opinion is that a juror who is clearly willing to impose the death penalty, but considers the severity of that decision carefully enough to recognize that there are certain circumstances under which it is not appropriate (*e.g.*, that it would only be appropriate in "severe situations," App. 63), is "substantially impaired." It is difficult to imagine, under such a standard, a juror who would not be considered so impaired, unless he delivered only perfectly unequivocal answers during the unfa-

miliar and often confusing legal process of *voir dire* and was willing to state without hesitation that he would be able to vote for a death sentence under any imaginable circumstance. Cf. *Adams* v. *Texas*, 448 U. S. 38, 50–51 (1980) ("We repeat that the State may bar from jury service those whose beliefs about capital punishment would lead them to violate the law or violate their oaths. But [the Constitution does not allow the exclusion of] jurors whose only fault was to take their responsibilities with special seriousness or to acknowledge honestly that they might or might not be affected").

Today, the Court has fundamentally redefined—or maybe just misunderstood—the meaning of "substantially impaired," and, in doing so, has gotten it horribly backwards. It appears to be under the impression that trial courts should be encouraging the inclusion of jurors who will impose the death penalty rather than only ensuring the exclusion of those who say that, in all circumstances, they cannot. The Court emphasizes that "the State has a strong interest in having jurors who are able to apply capital punishment within the framework state law prescribes." *Ante*, at 6. But that does not and cannot mean that jurors must be willing to impose a death sentence in every situation in which a defendant is eligible for that sanction. That is exactly the outcome we aimed to protect against in developing the standard that, contrary to the Court's apparent temporary lapse, still governs today. See *Gray*, 481 U. S., at 658 (explaining that to permit the exclusion of jurors other than those who will not follow their oaths "unnecessarily narrows the cross section of venire members" and "'stack[s] the deck against the petitioner'" (quoting *Witherspoon*, 391 U. S., at 523)).

Judge Kozinski's opinion for the Court of Appeals in this case is solidly grounded on the entire line of our cases recognizing the basic distinction dramatically illustrated by Justice Powell's opinion in *Darden* and by Justice

Rehnquist's statement in *Lockhart*. He surely was entitled to assume that the law had not changed so dramatically in the years following his service as a law clerk to Chief Justice Burger that a majority of the present Court would not even mention that basic distinction, and would uphold the disqualification of a juror whose only failing was to harbor some slight reservation in imposing the most severe of sanctions.

I respectfully dissent.

# SUPREME COURT OF THE UNITED STATES

———————

No. 06–413

———————

## JEFFREY UTTECHT, SUPERINTENDENT, WASH- INGTON STATE PENITENTIARY, PETITIONER *v.* CAL COBURN BROWN

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

[June 4, 2007]

JUSTICE BREYER, with whom JUSTICE SOUTER joins, dissenting.

I join JUSTICE STEVENS' dissent. I write separately to emphasize that, in my opinion, the majority's strongest piece of evidence—defense counsel's words "no objection" (uttered in response to the court's excusing Juror Z)— should play no role in our analysis. App. 75. The words "no objection" meant in context at most what they say, namely that defense counsel did not object to the judge's excusing Juror Z for cause. Often States treat such a failure to object as waiving a point. But that is not so here. That is because the Washington Supreme Court has told us that, under state law, counsel's failure to object is without significant legal effect. *Ante*, at 18–19 (opinion of the Court); *ante*, at 8 (STEVENS, J., dissenting); *State* v. *Levy*, 156 Wash. 2d 709, 719–720, 132 P. 3d 1076, 1080– 1081 (2006) (en banc). And that means we must treat this case as if a proper objection had been made.

The majority continues to rely upon the statement, however, not as proving an objection, but as helping to demonstrate courtroom "atmospherics," such as facial expressions or vocal hesitations or tones of voice sufficient to warrant excusing Juror Z for cause. *Ante*, at 15–18, 19. But in my view the majority reads too much into too little.

What the words "no objection" suggest is simply that defense counsel did not have any objection. And to find more in those few words treats them like a Rorschach blot, permitting a reviewing judge to affirm (or to reverse) the trial judge on no more than the subjective view of the written record that the appellate judge may take. Or, it simply offers a backdoor way to avoid the effect of Washington's procedural rule. The latter would wrongly ignore Washington law. The former would too often make it impossible to obtain meaningful review of silent records. There is no need, after all, to stretch the significance of ordinary statements and thereby to *assume* special atmospherics that support (or undercut) a trial judge's decision. Where special courtroom atmospherics matter, a lawyer (or the judge) can always make appropriate remarks for the record.

Basing my conclusions, then, on the written record itself, and in particular upon what Juror Z said in response to questions, I believe, for the reasons JUSTICE STEVENS sets forth (and applying AEDPA's strict standard), that the trial judge's decision to excuse Juror Z was constitutionally erroneous and a new trial is necessary.

For these reasons, I dissent.