BRISCOE, Chief Judge,
concurring in part and dissenting in part.
I would affirm Eizember’s convictions, but reverse his death sentence and remand for resentencing before a fair and impartial jury. I agree with the majority that Eizember has failed to establish his entitlement to federal habeas relief from his state court convictions. But, contrary to the majority, I find merit to Eizember’s claim “that he was denied an impartial jury and due process of law due to the [state] trial court’s denial of [a] for-cause challenge! ] against ... juror[ ] ... D.B.,” who “served and voted to condemn ... Eizember to death.” Aplt. Br. at 10. Eiz-ember raised this issue on direct appeal and the Oklahoma Court of Criminal Appeals (OCCA) rejected it. As discussed below, I conclude that the OCCA’s “adjudication of th[is] claim ... resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States.” 28 U.S.C. § 2254(d)(1). I in turn conclude, applying a de novo standard of review, that the state trial court likewise failed to apply the proper legal standard in assessing whether juror D.B. could impartially consider the sentencing options available in a death penalty case. Juror D.B. should have been stricken for cause. As a result, I conclude that Eizember has established his right to federal habeas relief on this claim in the form of a new sentencing proceeding.[9]

I. Facts relevant to the claim

The OCCA, in resolving Eizember’s direct appeal, outlined the basic facts relevant to this claim:
Jury selection in this case was begun by dividing .the prospective jurors into three groups and giving each individual a twelve page juror questionnaire to fill out. The written questionnaires were completed prior to the commencement of oral voir dire. Each of the three groups was then selected for a morning or afternoon session devoted to life and death qualification. After all potential jurors had been so qualified, general voir dire was conducted until thirty persons had been passed for cause. Then, *1149 recalling prospective jurors in the original order, the first twelve were seated in the jury box. Peremptory challenges were limited to those jurors in the box. As peremptory challenges were made, replacements were drawn from the pool of pre-qualified jurors.
Eizember v. State, 164 P.3d 208, 220 (Okla.Crim.App.2007) (paragraph number and footnote omitted).
[D.B.’s] juror questionnaire contained] six (6) questions relating to the death penalty. Question No. 42 asked if the prospective juror had ever formed an opinion either in favor or against the death penalty and if so to explain. D.B. wrote, “I firmly believe if you take a life you should lose yours.” In Question No. 61, prospective jurors were asked to explain their feelings about the death penalty. Juror D.B. wrote, “I have no reservations about seeing someone put to death so long as it has been proven the person is guilty, especially if they have taken the lives of others.” To Question No. 62, which asked “what purpose do you think the death penalty serves in our society?” D.B. responded, “keeps taxpayers from having to support a criminal for the remainder of their life.” Question No. 63 asked if the prospective juror thought the death penalty in Oklahoma is used too often. D.B. responded, “definitely not too often.” Question No. 64 listed 5 alternatives and the prospective juror was instructed to select the one which best summarized their general views about capital punishment. The choices were as follows:
1. I am opposed to capital punishment under any circumstances.
2. I am opposed to capital punishment except, in a few cases where it may be appropriate.
3. I am neither generally opposed, nor generally in favor of capital punishment.
4. I am in favor of capital punishment, except in a few cases where it may not be appropriate.
5. I am strongly in favor of capital punishment as an appropriate penalty.
D.B. checked the last alternative. Question No. 65 asked the following:
Assume you are on a jury to determine the sentence of a defendant who has already been convicted of a very serious crime. If the law gives you a choice of death or life imprisonment, or some other penalty; (check one)
1. I could not vote for the death penalty regardless of the facts and circumstances of the case.
2. There are some kinds of cases in which I know I could not vote for the death penalty even if the law allowed me to, but others in which I would be willing to consider voting for it.
3. I would consider all of the penalties provided by law and the facts and circumstances of the particular case.
4. I would usually vote for the death penalty in a case where the law allows me to.
5. I would always vote for the death penalty in cases where the law allows me to.'
D.B. checked the third alternative that she “would consider all of the penalties provided by law and the facts and circumstances of the particular case.” No other questions on the written questionnaire pertained to capital punishment.
• Under questioning by the prosecutor during voir dire, Juror D.B. said she could consider all three punishment options — the death penalty, life without parole, and life in prison. She said she would do so based on the evidence brought forth in the courtroom and the instructions given by the court. She *1150 said she could put aside any personal beliefs or predispositions and decide the case on the evidence, and she did not have any moral, ethical or religious obligations that would keep her from doing so.
Under questioning by defense counsel, Juror D.B. reiterated that she could consider all three possible punishments. When specifically asked if she could consider a life sentence if the defendant was found guilty of intentional murder, she replied, “I could consider a sentence of life.” Defense counsel then asked if her consideration “would be any more meaningful than my consideration of moving furniture?” She replied, “yes.” Defense counsel’s voir dire of D.B. continued as follows:
MR. CORGAN (defense counsel): ... How about the sentence of life without parole, could you consider that as well?
PROSPECTIVE JUROR D.B.: If the death penalty was not an option.
MR. CORGAN: Okay, tell me what you mean by that.
PROSPECTIVE JUROR D.B.: If they’re in prison for the remainder of their life without the possibility of parole why not the death penalty?
MR. CORGAN: All right, so are you, are you telling me then that if you had. a situation where it was laid out on the table, life, life without parole or death, then you would automatically consider one of the those?
PROSPECTIVE JUROR D.B.: Automatically consider one of—
MR. CORGAN: One of those punishments over the others?
PROSPECTIVE JUROR D.B.: Probably.
MR. CORGAN: And—
PROSPECTIVE JUROR D.B: Yes.
MR. CORGAN: And that would be death?
PROSPECTIVE JUROR D.B: Yes.
MR. CORGAN: So—
PROSPECTIVE JUROR D.B: Let me get you, you said that the evidence had already been there and it’s over and it’s the penalty phase, right?
MR. CORGAN: When we talk about punishment you’ve already made the determination of intentional murder beyond a reasonable doubt, okay?
PROSPECTIVE JUROR D.B: Uh-huh.
MR. CORGAN: That’s where we are. Within that context are you telling me that you would automatically say it should be the death penalty?
PROSPECTIVE JUROR D.B: I would have to look at all three but just off the cuff, it would probably be death.
MR. CORGAN: And do you feel that you could give meaningful consideration to life?
PROSPECTIVE JUROR D.B: Yes.
MR. CORGAN: Do you feel that you could give meaningful consideration to life without parole?
PROSPECTIVE JUROR D.B: I would have to try hard.
MR. CORGAN: Okay and I appreciate that answer. In trying hard if you and my client were to switch places today and you were on trial would you want a juror with that type of mindset?
PROSPECTIVE JUROR D.B: Personally, yes.
MR. CORGAN: Okay.
PROSPECTIVE JUROR D.B: Okay.
MR. CORGAN: Do you feel like—
PROSPECTIVE JUROR D.B: I would not want to spend my life in prison without the possibility of parole.
*1151 Later during voir dire, defense counsel asked the panel if they understood that if the State does not prove an aggravating circumstance to the jury’s satisfaction beyond a reasonable doubt then the jury would not be allowed to consider the option of death. When specifically asked if she understood, Juror D.B. replied, “if it’s not an option I wouldn’t have a problem with it” and that she could consider the other two punishments of life and life without parole. This was the extent of Juror D.B.’s voir dire on her views of capital punishment.
Id. at 223-225 (paragraph numbers omitted).
After [Eizemberj’s portion of the life/ death qualification, defense counsel raised challenges for cause to several prospective jurors including Jurors D.B. and J.S. [In particular, defense counsel argued that D.B. “said in her questionnaire that she firmly believes that if you take a life you should lose yours,” and that this answer “contrasted to the answers that she gave during our Voir Dire examination in the ... courtroom.” Tr. Vol. 2 at 276.] The trial court overruled the challenges. [In doing so, the trial court stated that “the questionnaires are to gain information not to be used as traps for when answers are given by prospective jurors who have not been informed of the law. So I am not going to allow them to be used for that purpose.” Tr. Vol. 2 at 279.] When it came time to exercise peremptory challenges, Juror D.B. took a seat in the jury box as a result of defense counsel’s exercise of his eighth challenge. With his ninth peremptory challenge, [Eizem-ber] removed prospective juror J.L. who was replaced on the panel by J.S. This left both Juror D.B. and Juror J.S. on the jury. After exercising his final peremptory challenge, defense counsel again asked that Juror J.S. be excused for cause based upon his inability to consider all three possible punishments, and based upon the fact that in rescheduling a surgery, counsel surmised “he’s just almost too interested in being a juror.” The trial court overruled the challenge for cause. Defense counsel then informed the court that if the defense had been granted additional peremptory challenges, Jurors D.B. and J.S. would be struck from the jury.
Id. at 220 (paragraph number omitted).

II. The OCCA’s ruling on the claim

Eizember argued on direct appeal that the trial court’s refusal to strike jurors D.B. and J.S. from the jury deprived him of his constitutional rights to due process and trial by an impartial jury. In addressing this claim on direct appeal, the OCCA stated:
[Eizember] suggests the responses on the juror questionnaire are sufficient by themselves to excuse a prospective juror for cause based upon his or her views of the death penalty. Our research has yielded no capital cases where responses to pre-trial juror questionnaires, without voir dire, have been found sufficient to excuse jurors for cause, based upon their views of capital punishment. Indeed, the Supreme Court has warned against oversimplifying the inquiry as to whether jurors can perform their duty notwithstanding their views on the death penalty. “[D]eterminations of juror bias cannot be reduced to question-and-answer sessions which obtain results in the manner of a catechism”. Wainwright v. Witt, 469 U.S. 412, 424, 105 S.Ct. 844, 852, 83 L.Ed.2d 841 (1985).
“Voir dire examination serves the dual purposes of enabling the court to select an impartial jury and assisting counsel in exercising peremptory challenges”. Mu’Min v. Virginia, 500 U.S. 415, 431, 111 S.Ct. 1899, 1908, 114 *1152 L.Ed.2d 493 (1991). See also Warner v. State, 2006 OK CR 40, ¶15, 144 P.3d 838, 858. An important aspect of voir dire is to educate prospective jurors on what will be asked of them under the law. As the trial court in this case noted, the questionnaires are a.means to collect information and are not to be used “as traps” for prospective jurors who have not yet been informed of the law. In our review of the written questionnaires, we have found they did not advise the jury of the law they would be required to follow, nor did they discuss or explain the process the jurors would be- required to follow in the punishment phase of trial, ie., determining if the alleged aggravator or aggravators had been proved beyond a reasonable doubt and then weighing the aggravators and mitigators to determine the appropriate punishment. This very important part of the jurors’ duties in a capital case was not even broached until the oral voir dire, and then not fully explained until written instructions were given at the close of the second stage evidence. It is the voir dire process which allows counsel and court alike to determine whether the prospective jurors can in fact follow their instructions and oath and whether there are grounds to challenge a potential juror. We find the pre-trial questionnaire cannot trump the actual voir dire. The responses to the written questionnaire regarding views on the death penalty are not to be considered in isolation, but in context of the other responses to the questionnaire and oral responses given during voir dire in open court. See Witt, 469 U.S. at 429, 105 S.Ct. at 855 (the trial judge’s “predominant function in determining juror bias involves credibility findings whose bias cannot be easily discerned from an appellate record.”) See also United States v. Chanthadara, 230 F.3d 1237, 1269 (10th Cir.2000) (“because the jurors are vested with greater discretion in capital cases, the examination of prospective jurors must be more careful than in non-capital cases”).
The proper standard for determining when a prospective juror may be excluded for cause because of his or her views on capital punishment is “whether the juror’s views would ‘prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.’ ” Witt, 469 U.S. at 424, 105 S.Ct. at 852. See also Gray v. Mississippi 481 U.S. 648, 658, 107 S.Ct. 2045, 2051, 95 L.Ed.2d 622 (1987). Inherent in this determination' is that the potential juror has been fully informed of the law and his or her responsibilities under the law and ’oath of a juror. This standard does not require a juror’s bias be proved with unmistakable clarity; neither must the juror express an intention to vote against the death penalty automatically. Witt, 469 U.S. at 424, 105 S.Ct. at 852. “Deference must be paid to the trial judge who sees and hears the jurors”. Id., 469 U.S. at 425, 105 S.Ct. at 853. See also Uttecht v. Brown, 551 U.S. 1, 127 S.Ct. 2218, 2224, 167 L.Ed.2d 1014 (2007) (“deference to the trial court is appropriate because it is in a position to assess the demeanor of the venire, and of the individuals who compose it, a factor of critical importance in assessing the attitude and qualifications of potential jurors”).
This Court has adhered to the principles set forth in Witt. See Glossip v. State, 2007 OK CR 12, ¶¶ 31-33, 157 P.3d 143, 150-151; Williams v. State, 2001 OK CR 9, ¶ 10, 22 P.3d 702, 709 (and cases cited therein). We have said the Witt standard only requires that each juror be willing to consider each of the three statutory punishments: the death penalty, life imprisonment without *1153 the possibility of parole, and life imprisonment (with the possibility of parole). Glossip, 2007 OK CR 12 at ¶31, 157 P.3d at 150. See also Williams, 2001 OK CR 9 at ¶ 10, 22 P.3d at 709-710. Further, all doubts regarding juror impartiality must be resolved in favor of the accused. Williams, 2001 OK CR 9 at ¶ 10, 22 P.3d at 709-710. This Court will look to the entirety of the juror’s voir dire examination to determine if the trial court properly excused the juror for cause. Id. As the trial court personally observes the jurors and their responses, this Court will not disturb its decision absent an abuse of discretion. Id.
Id. at 220-222 (alteration in original; internal paragraph numbers and footnotes omitted).
Reviewing D.B.’s responses in total, her responses do not demonstrate an impossible bias towards the death penalty. Individual responses read in isolation may suggest such a bias as [Eizember] claims. However, other responses indicate Juror D.B. could be a fair and impartial juror. This situation points out the importance of the oral voir dire. Although the juror questionnaire mentioned there were three possible punishments for a conviction for intentional murder, no options other than the death penalty were addressed. The questionnaire did not explain the law regarding proof of aggravators or weighing of the mitigating evidence against the ag-gravators. Despite these omissions, D.B. indicated she could consider all punishment options. It was not until voir dire, and specifically questioning by defense counsel, that the juror’s views on the other punishment options were explored. D.B. did not say she would automatically consider the death sentence. Her response that “off the cuff” she would consider death as punishment for intentional murder does not indicate a predisposition toward the death penalty, but rather illustrates a “gut reaction.” We are confident that any determination made during jury deliberations would be an informed decision and not merely “off the cuff.”
As further evidence of her partiality, [Eizember] cites to Juror D.B.’s failure to state that she could “fairly” consider all three punishment options. See Hanson v. State, 2003 OK CR 12, ¶ 10, 72 P.3d 40, 48 (“that single1 word [fairly] carries an inescapable constitutional weight”.) Here, the court asked the entire panel whether they could give “fair consideration” to each punishment option. That neither the prosecutor nor defense counsel used the term “fairly consider” in their examination of the juror is not grounds for a finding of partiality. Juror D.B.’s responses suggest she might have trouble considering all three options equally. However, that is not the standard required by law. To withstand a challenge for cause concerning punishment issues, a venireperson need only be willing to consider all the penalties provided by law and not be irrevocably committed to any one punishment option before the trial has begun. Gilbert v. State, 1997 OK CR 71, ¶ 26, 951 P.2d 98, 108. Here, Juror D.B. indicated she could consider all possible punishment options. Any ambiguities in D.B.’s responses or questions as to her ability to be a fair and impartial juror were for the trial court to resolve. Having the benefit of observing D.B.’s demeanor throughout voir dire, the court found her responses credible and insufficient to excuse her for cause. Our review of the totality of her voir dire, written and oral responses, supports the trial court’s finding that Juror D.B. did not have such a strong bias towards the *1154 death penalty that the performance of her duties as juror would be prevented or substantially impaired. Accordingly, the trial court did not abuse its discretion in refusing to remove her for cause.
Id. at 225-26 (last alteration in original; internal paragraph numbers and footnote omitted).

III. Analysis

Standard of review

Because the claim at issue was adjudicated on the merits by the OCCA, our standard of review is governed by 28 U.S.C. § 2254(d)(1), which provides:
An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—
(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States....
28 U.S.C. § 2254(d)(1).
In Williams v. Taylor, 529 U.S. 362, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000), the Supreme Court discussed, at length; the meaning of the two clauses of § 2254(d)(1). “A state court decision,” the Supreme Court explained, is “contrary to ... clearly established [Supreme Court] precedent if the state court applies a rule that contradicts the governing law set forth in [the Supreme Court’s] cases,” id. at 405, 120 S.Ct. 1495, or “if the state court confronts a set of facts that are materially indistinguishable from a decision of th[e] [Supreme] Court and nevertheless arrives at a result different from [Supreme Court] precedent,” id. at 406, 120 S.Ct. 1495. The Court further explained that “a state-court decision can involve an ‘unreasonable application’ of th[e] Court’s clearly established precedent in two ways.” Id. at 407, 120 S.Ct. 1495. “First, a state court decision involves an unreasonable application of th[e] Court’s precedent if the state court identifies the correct governing legal rule from th[e] Court’s cases but unreasonably applies it to the facts of the particular state prisoner’s case.” Id. “Second, a state-court decision also involves an unreasonable application of th[e] Court’s precedent if the state court either unreasonably extends a legal principle from [the Court’s] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply.” Id.

Clearly established federal law

Eizember points to several Supreme Court cases as supplying the clearly established federal law applicable to this claim. To begin with, he points to Uttecht v. Brown, 551 U.S. 1, 127 S.Ct. 2218, 167 L.Ed.2d 1014 (2007) and Morgan v. Illinois, 504 U.S. 719, 112 S.Ct. 2222, 119 L.Ed.2d 492 (1992), for the principle that “[t]he Constitution,” in particular “the Sixth Amendment and the Due Process Clause of the Fourteenth Amendment,” “requires an unbiased jury.” Aplt. Br. at 26. He in turn cites Wainwright v. Witt, 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985), for the principle that “[a] juror’s bias need not be proved with ‘unmistakable clarity’ before he should be excused for cause.” Id. at 27.
Addressing these cases in chronological order, the Supreme Court in Witt “examined ... the procedures for selection of jurors in criminal trials involving the possible imposition of capital punishment.” 469 U.S. at 414, 105 S.Ct. 844. In doing so, the Court outlined several principles that are applicable to Eizember’s appeal. To begin with, the Court emphasized that, *1155 “[a]s with any other trial situation where an adversary wishes to exclude a juror because of bias, ... it is the adversary seeking exclusion who must demonstrate, through questioning, that the potential juror lacks impartiality.” Id. at 423, 105 S.Ct. 844. In turn, the Court noted, “[i]t is then the trial judge’s duty to determine whether the challenge is proper.” Id. The Court explained that “the proper standard for determining when a prospective juror may be excluded for cause because of his or her views on capital punishment ... is whether the juror’s views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.” Id. at 424, 105 S.Ct. 844 (internal quotation marks omitted). “[T]his standard,” the Court held, “does not require that a juror’s bias be proved with ‘unmistakable clarity.’” Id. But, the Court noted, “there will be situations where the trial judge is left with the definite impression that a prospective juror would be unable to faithfully and impartially apply the law.” Id. at 425-26, 105 S.Ct. 844. “[T]his is why,” the Court explained, “deference must be paid to the trial judge who sees and hears the juror.” Id. at 426,105 S.Ct. 844.
The Court in Witt also emphasized that “a trial judge’s finding that a particular venireman was not biased and therefore was properly seated [i]s a finding of fact subject to § 2254(d).” Id. at 428, 105 S.Ct. 844. “[S]ueh a finding,” the Court noted, “is based upon determinations of demean- or and credibility that are peculiarly within a trial judge’s province.” Id. The same holds true, the Court held, for “a trial court’s determination that a prospective capital sentencing juror was properly excluded for cause.” Id. at 429, 105 S.Ct. 844. Finally, the Court held that in making these determinations, a “trial judge is of course applying some kind of legal standard to what he sees and hears, but his predominant function in determining juror bias involves credibility findings whose basis cannot be easily discerned from an appellate record.” Id.
In Morgan, the Supreme Court considered “whether, during voir dire for a capital offense, a state trial court may, consistent with the Due Process Clause of the Fourteenth Amendment, refuse inquiry into whether a potential juror would automatically impose the death penalty upon conviction of the defendant.” 504 U.S. at 721, 112 S.Ct. 2222. In addressing this question, the Court held that “[a] juror who will automatically vote for the death penalty in every case will fail in good faith to consider the evidence of aggravating and mitigating circumstances as the instructions require him to do.” Id. at 729, 112 S.Ct. 2222. The Court explained that “because such a juror has already formed an opinion on the merits, the presence or absence of either aggravating or mitigating circumstances is entirely irrelevant to such a juror.” Id. “Therefore,” the Court held, “based on the requirement of impartiality embodied in the Due Process Clause of the Fourteenth Amendment, a capital defendant may challenge for cause any prospective juror who maintains such views.” Id. And, the Court held, “[i]f even one such juror is empaneled and the death sentence is imposed, the State is disen-titled to execute the sentence.” Id.
The Court in turn held that these principles afford a defendant the “right to make inquiry” during voir dire, id. at 734, 112 S.Ct. 2222, in order to ferret out “those biased persons on the venire who as jurors would unwaveringly impose death after a finding of guilt,” id. at 733, 112 S.Ct. 2222. Such inquiry, the Court emphasized, is not limited to “general fairness and ‘follow the law’ questions.” Id. at 734, 112 S.Ct. 2222. Instead, the Court held, a defendant is “entitled, upon his request, to inquiry discerning those jurors who, even prior to the *1156 State’s ease in chief, ha[ve] predetermined the terminating issue of [the] trial, that being whether to impose the death penalty.” Id. at 736,112 S.Ct. 2222.
Finally, in Utbecht, the Supreme Court reviewed its past precedents and noted that they established “at least four principles” relevant to voir dire during a capital trial:
First, a criminal defendant has the right to an impartial jury drawn from a venire that has not been tilted in favor of capital punishment by selective prosecutorial challenges for cause. Second, the State has a strong interest in having jurors who are able to apply capital punishment within the framework state law prescribes. Third, to balance these interests, a juror who is substantially impaired in his or her ability to impose the death penalty under the state-law framework can be excused for cause; but if the juror is not substantially impaired, removal for cause is impermissible. Fourth, in determining whether the removal of a potential juror would vindicate the State’s interest without violating the defendant’s light, the trial court makes a judgment based in part on the demeanor of the juror, a judgment owed deference by reviewing courts.
551 U.S. at 9, 127 S.Ct. 2218 (internal citations omitted).

Eizember’s challenge to the OCCA’s decision

Eizember argues that the OCCA’s decision “was contrary to and an unreasonable application of well-established Supreme Court precedent.” Aplt. Br. at 31. In particular, Eizember asserts that the OCCA, in assessing the totality of D.B.’s responses, “wrongly conclude[d] that any consideration [of the three sentencing options] w[ould] do so long as D.B. w[a]s not ‘irrevocably committed to any one punishment.’ ” Id. at 28 (quoting Eizember, 164 P.3d at 226). “That,” Eizember argues, “is not the correct standard.” Id. After carefully examining the OCCA’s decision and relevant Supreme Court precedent, I and my concurring colleague agree that the OCCA applied an incorrect legal standard when addressing Eizember’s assertion that juror D.B. was biased. See Cone. Op. at 1163 (McHugh, J., concurring).
The critical flaw in the OCCA’s analysis is that, in evaluating D.B.’s responses, it applied a legal standard that is inconsistent with clearly established federal law. To be sure, the OCCA began its analysis by correctly identifying and quoting from Witt. 164 P.3d at 221. And it concluded its analysis with language that can fairly be said to track Witt. Id. at 226. The problem, however, is what lies in between.
After initially identifying and quoting from Witt, the OCCA stated that it had long “adhered to the principles set forth in Witt.” Id. at 222. The OCCA explained: “We have said the Witt standard only requires that each juror be willing to consider each of the three statutory punishments: the death penalty, life imprisonment without the possibility of parole, and life imprisonment (with the possibility of parole).” Id. Subsequently, in “[r]eview-ing D.B.’s responses in total” and concluding that they “d[id] not demonstrate, an impossible bias towards the death penalty,” id. at 225, the OCCA relied on its own precedent and the standard developed thereunder, which it believed was consis-' tent with Witt:
Juror D.B.’s responses suggest she might have trouble considering all three options equally. However, that is not the standard required by law. To withstand a challenge for cause concerning punishment issues, a venireperson need only be willing to consider all the penalties provided by law and not be irrevocably committed to any one punishment option before the trial has begun.
*1157 Id. at 225-26 (citing Gilbert v. State, 951 P.2d 98, 108 (Okla.Crim.App.1997)).
From what I can determine, this “irrevocably committed” standard was developed by the OCCA shortly after, and was based upon the OCCA’s interpretation of, the Supreme Court’s decision in Witherspoon v. Illinois, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968). See, e.g., Davis v. State, 665 P.2d 1186, 1191 (Okla.Crim.App.1983); Gibson v. State, 501 P.2d 891, 896 (Okla.Crim.App.1972); Koonce v. State, 456 P.2d 549, 554 (Okla.Crim.App.1969). More specifically, the standard was based upon the following language found in footnote 21 of Witherspoon:
Just as veniremen cannot be excluded for cause on the ground that they hold such views [i.e., “general objections to the death penalty or ... conscientious or religious scruples against its infliction”], so too they cannot be excluded for cause simply because they indicate that there are some kinds of cases in which they would refuse to recommend capital punishment. And a prospective juror cannot be expected to say in advance of trial whether he would in fact vote for the extreme penalty in the case before him. The most that can be demanded of a venireman in this regard is that he be willing to consider all of the penalties provided by state law, and that he not be irrevocably committed, before the trial has begun, to vote against the penalty of death regardless of the facts and circumstances that might emerge in the course of the proceedings.
301 U.S. at 522 n. 21, 57 S.Ct. 868.[10]
Importantly, the Supreme Court has since held that the language of footnote 21 in Witherspoon does not set forth the controlling standard for assessing potential jurors in a capital case. In Witt, the Supreme Court recognized that its post-Witherspoon decisions had deviated from the language of footnote 21 and “demonstrate[d] no ritualistic adherence to a requirement that a prospective juror make it ‘unmistakably clear ... that [she] would automatically vote [for or] against the imposition of capital punishment_’” 469 U.S. at 419, 105 S.Ct. 844 (first alteration in original; italics in original). In particular, the Supreme Court noted that the standard it had announced and applied in Adams v. Texas, 448 U.S. 38, 100 S.Ct. 2521, 65 L.Ed.2d 581 (1980), “differed] markedly from the language of footnote 21” in Witherspoon. 469 U.S. at 421, 105 S.Ct. 844. Because of the confusion caused by these conflicting decisions, the Supreme Court took “th[e] opportunity to clarify [its] decision in Witherspoon, and to reaffirm the ... standard from Adams as the proper standard for determining when a prospective juror may be excluded for cause because of his or her views on capital punishment.” Id. at 424, 105 S.Ct. 844. “That standard [i.e., the Adams standard],” the Court stated, “is whether the juror’s views would ‘prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.’ ” Id. (quoting Adams, 448 U.S. at 45, 100 S.Ct. 2521). The Court “note[d] that, in addition to dispensing with Witherspoon’s reference to ‘automatic’ decisionmaking, this standard likewise does not require that a juror’s bias be proved with ‘unmistakable clarity.’ ” Id. “This is because,” the Court stated, “determinations of juror bias cannot be reduced to question-and-answer sessions which obtain results in the manner of a catechism.” Id.
*1158 The problem is that, since Witt, the OCCA has failed to revise or abandon its “irrevocably committed” standard. Instead, the OCCA has concluded that its “irrevocably committed” standard is “[e]s-sentially ... the same” as the Witt standard, Carter v. State, 879 P.2d 1234, 1244 (Okla.Crim.App.1994), and it has continued to routinely apply the standard in capital cases, including Eizember’s. Indeed, in analyzing Juror D.B.’s written and oral responses and concluding that the state “trial court did not abuse its discretion in refusing to remove her for cause,” the OCCA emphasized that she “indicated she could consider all possible punishment options.” Eizember, 164 P.Sd at 226.
Quite clearly, however, the OCCA’s “irrevocably committed” standard is not the same as, and indeed is less demanding than, the controlling standard outlined in Witt (i.e., the Adams standard). The result is that a potential juror could satisfy the “irrevocably committed” standard and be permitted to sit as a juror, yet fail to meet the Witt/Adams standard.
And that appears to be precisely the situation in Eizember’s case with respect to juror D.B. To begin with, D.B.’s responses to questioning by defense counsel during voir dire clearly suggested that she would have difficulty giving adequate consideration to the option of life without parole. When asked by defense counsel if she would “automatically” choose one of the three possible sentencing options for capital murder, she stated that she “[pjrobably” would choose a sentence of death. Defense counsel followed up on D.B.’s response by asking her directly if she would automatically choose the death penalty. D.B. responded, “I would have to look at all three but just off the cuff, it would probably be death.” Relatedly, D.B. stated that she “would have to try hard” to give- meaningful consideration to the sentence of life without parole. She explained that death would be her own choice if she were a defendant choosing between those two options. Notably, these answers, which clearly displayed a strong, if not automatic, preference for the death penalty, were largely consistent with her answers on the written questionnaire. For example, on the written questionnaire, D.B. was asked “What purpose do you think the death penalty serves in our society.” D.B.’s Jury Information Questionnaire at 9. D.B. stated in response: “Keeps taxpayers from having to support a criminal for the remainder of their life.” Id. When asked on the questionnaire to “[cjheck the ‘one’ statement which ‘best’ summarizes your general views about capital punishment (the death Penalty),” D.B. checked option #5, which stated, “I am strongly in favor of capital punishment as an appropriate penalty.” Id. Lastly, in response to the question “What are your feelings about the death penalty?,” D.B. stated, “I have no reservations about seeing someone put to death so long as it has been proven the person is guilty, especially if they have taken the lives of others.” Id.
It appears to be a close question whether these responses were sufficient to satisfy the OCCA’s own “irrevocably committed” standard. Although D.B. came quite close to indicating that she would automatically vote to impose the death penalty, her responses could perhaps reasonably be construed as indicating a willingness to at least consider all three available penalties. Under the Witt/Adams standard, however, it is clear that D.B.’s views would have prevented or substantially impaired the performance of her duties as a juror in accordance with her instructions and oath.[11] More specifically, D.B.’s responses *1159 “made it unmistakably clear that [she] could not be trusted to abide by existing law and to follow conscientiously the instructions of the trial judge.” Witt, 469 U.S. at 419, 105 S.Ct. 844 (internal quotation marks omitted). Consequently, she should have been stricken for cause under that standard.
For these reasons, the OCCA’s analysis of Eizember’s challenge to the state trial court’s refusal to excuse juror D.B. was “contrary to, or involved an unreasonable application of, clearly established Federal law.” 28 U.S.C. § 2254(d)(1). “[Although” this “does not [automatically] entitle [Eizember] to the issuance of a writ of habeas corpus, it effectively removes AEDPA’s prohibition on the issuance of a writ.” Milton v. Miller, 744 F.3d 660, 670-71 (10th Cir.2014) (internal citation omitted). That in turn “requires us to review de novo his” claim regarding the trial court’s failure to excuse juror D.B. for cause, “rather than deferring to the OCCA’s resolution of that claim.” Id. at 671.

The state trial court’s determination

In determining whether “a prospective capital sentencing juror” should be “excluded for cause,” a trial court “applies] some kind of legal standard to what [it] sees and hears” from the juror and it ultimately makes a finding of fact regarding that juror’s state of mind. Witt, 469 U.S. at 429, 105 S.Ct. 844. Generally speaking, such a finding is “owed deference by reviewing courts” because the trial court was in a unique “position to assess the demeanor of the” juror. Uttecht, 551 U.S. at 9, 127 S.Ct. 2218.
As I shall proceed to describe, the state trial court in this case made such a finding regarding juror D.B. But in doing so, the state trial court, presumably and understandably attempting to follow OCCA precedent, applied an improper legal standard. As a result, its finding regarding juror D.B.’s impartiality is essentially meaningless and entitled to no deference because it failed to apply the correct Witt/ Adams standard.
At the beginning of Eizember’s trial, the state trial court split the pool of potential jurors into three groups. Juror D.B. was in the second group. At the outset of the questioning of the second group, the state trial court gave the potential jurors a brief description of the case and informed them that the purpose of the questioning was to “see[ ] if there are any of you who, have preconceived notions or ideas or beliefs that you cannot set aside that are not fit to hear this case.” Tr., Vol. 1 at 164. The state trial court then conducted its own questioning of the second group. In doing so, it asked the potential jurors:
If you find the defendant guilty of Murder in the First Degree can you consider all three of these legal punishments, death, imprisonment for life without parole or imprisonment for life and impose the one warranted by law and evidence? Okay, now that was a long question, wasn’t it, but what we are finding out here is that and remember we are assuming just for the purpose of this question that you do find the defendant guilty of Murder in the First Degree, can you just give a fair consideration to all three possible punishments and base *1160 your decision solely upon the facts in the case, not upon any preconceived bias for or against any one of the three punishments?
Id. at 174-75.
As potential jurors responded, the state trial court repeatedly summarized the legal standard it was applying:
The question is can you consider all three of the punishments, possible ranges of punishment?
Id. at 178.
[C]an you give consideration to all three ranges of punishment and impose the one that the facts and the law requires ... ?

Id.

Is there anyone on the third row that if the jury found beyond a reasonable doubt the defendant is guilty of the Murder in the First Degree could not consider all three of the legal punishments which are death, imprisonment for life without parole or imprisonment for life, is there any person on the third row that cannot consider any one, any one of those three or that would automatically impose one of those three?
Id. at 180.
What I want to know is just the basic rule, will you consider all three of them or are [you] telling me that your mindset is against life so strongly that it cannot be considered or that you have a prejudice against—
Tr. Vol. 2 at 255.[12]
These statements from the state trial court make clear that it was applying the OCCA’s own “irrevocably committed” standard, rather than the Witt/Adams standard, in assessing the responses from each of the potential jurors.[13] As a result, its finding that juror D.B. was qualified under the “irrevocably committed” standard to serve on Eizember’s jury, even if afforded deference by this court, tells us nothing about whether juror D.B. was qualified to serve under the proper Witt/ Adams standard.

The majority opinion

The majority makes several assertions that are erroneous and thus require a response. To begin with, the majority is wrong in asserting that Eizember forfeited any challenge to the OCCA’s use of its own “irrevocably committed” standard. According to the majority, “[i]n six and a half years of proceedings in federal court ... Eizember never argued ... that the OCCA employed a legal standard ‘contrary to’ Witt.” Maj. Op. at 1140-41. “Instead,” the majority asserts, “accepting that the OCCA correctly identified Witt as the governing standard, ... Eizember has argued *1161 only that the OCCA’s application of that standard — the answer it gave to the question Witt poses — was unreasonable given the facts in this particular case.” Id. Indeed, the majority asserts, “there’s nothing in ... Eizember’s district court petition” or “in his opening brief in this court” that “resembl[es] the” legal flaws I have outlined above. Id. As I shall outline below, however, the majority ignores key passages in Eizember’s federal court pleadings and ultimately paints a distorted picture of Eizember’s legal challenge to the trial court’s refusal to strike juror D.B. The majority also wrongly assumes that, in considering the totality of juror D.B.’s responses, the OCCA actually answered the question that Witt poses.
Ground I of Eizember’s federal habeas petition alleged that “the trial court’s erroneous denial of challenges for cause left biased jurors on [his] jury, depriving him of trial by an impartial jury and due process in violation of the Sixth and Fourteenth Amendments.” Dist. Ct. Docket No. 24 at 28 (capitalization omitted). In support of this issue, Eizember outlined the facts relevant to the claim, as well as the OCCA’s resolution of the claim. Id. at 23-29. In a section entitled “Argument and Authority,” Eizember then cited Supreme Court and Tenth Circuit law regarding the right to an impartial jury, and proceeded to discuss the application of that law to jurors D.B. and J.S. Id. at 30-38. In the subsection discussing juror D.B., Eiz-ember, quoting from the dissenting opinion of OCCA Judge Chapel, characterized as “ ‘absurd,’ ” id. at 32 (quoting Eizember; 164 P.3d at 249 (Chapel, J., dissenting)), the OCCA majority’s “suggestion] that any consideration [of the three available sentencing options] will do as long as the juror is not ‘irrevocably committed to any one punishment,’ ” id. (quoting Eizember, 164 P.3d at 226). Notably, as I have already indicated, Eizember repeated this argument in his opening appellate brief:
Discounting the fact that D.B.’s “responses suggest she might have trouble considering all three options equally,” the OCCA majority wrongly concludes that any consideration will do as long as D.B. is not “irrevocably committed to any one punishment.” Eizember, 164 P.3d at 226. That is not the correct standard.
Aplt. Br. at 28. These arguments, though brief, correctly identified the key flaw in the OCCA’s analysis of juror D.B. and its purported application of the Witt standard.
The majority, in its effort to avoid the issue, characterizes these as nothing more than “stray sentences” that “are insufficient to present an argument ... in a way that might fairly inform opposing counsel or a court of its presence in the case.” Maj. Op. at 1141. That characterization, however, is simply inaccurate. At worst, Eizember’s counsel could, and perhaps should, have argued the issue in greater detail. But nothing about the above-quoted statements was random, incidental, unintentional, or otherwise lacking in purpose. See Webster’s Third New Int’l Dictionary at 2258 (1993) (defining the adjective “stray”). Quite clearly, Eizember’s counsel understood and attempted to convey that the OCCA had applied an improper legal standard in assessing the totality of D.B.’s responses. Moreover, Eizember’s counsel in no way conceded or accepted that the OCCA correctly identified and employed the Witt standard. Maj. Op. at 1140-41.
The majority also inaccurately frames my position in this case by suggesting that I think “we don’t need to reach the question whether the OCCA reasonably applied Witt because that court didn’t apply Witt at all.” Maj. Op. at 1140. The fact of the matter is that I agree we must examine the OCCA’s purported application of Witt because that is precisely where the *1162 OCCA’s error occurred. As I have previously noted, the OCCA began addressing Eizember’s challenge to juror D.B. and J.S. by properly identifying Witt as providing the controlling legal standard. In the course of purportedly applying that standard to juror D.B., however, the OCCA actually relied on its own “irrevocably committed” standard; a standard the OCCA erroneously thought was the equivalent of the Witt standard. Thus, there was no error on the part of the OCCA in the initial “identification” stage. Rather, the OCCA erroneously deviated from the Witt standard in the course of attempting to “apply” it to juror D.B. In light of all this, it is perfectly understandable why Eizember has focused his arguments on the OCCA’s purported “application” of Witt.
Further, the majority is wrong in suggesting that we can we neatly divide our analysis in this case between § 2254(d)(l)’s “contrary to” and “unreasonable application” clauses, or that the error I have outlined necessarily falls within the “contrary to” clause. Indeed, a reasonable argument can be made that the OCCA’s error in this case implicates both clauses of § 2254(d)(1). In terms of the “contrary to” clause, the OCCA actually applied (but did not realize it was doing so) “a rule that contradicts the governing law set forth in” Witt. Williams, 529 U.S. at 405, 120 S.Ct. 1495. In terms of the “unreasonable application” clause, the OCCA “identifie[d] the correct governing legal rule ... but unreasonably applie[d] it to the facts of [Eizem-ber’s] case” by unwittingly substituting a standard (the “irrevocably committed” standard) that it thought was the equivalent of Witt. Williams, 529 U.S. at 407, 120 S.Ct. 1495.
In any event, it matters not which clause of § 2254(d)(1) we rely upon because, contrary to the majority’s assertion, both the parties and the district court consistently treated Eizember’s claim as invoking both clauses of § 2254(d)(1). Further, the respondent in this case has never asserted any type of forfeiture argument, either in the district court or before us.
In the end, I submit that Eizember, who is challenging the constitutionality of a death sentence “unique in its severity and irrevocability,” Barclay v. Florida, 468 U.S. 939, 958, 103 S.Ct. 3418, 77 L.Ed.2d 1134 (1983) (Stevens, J., concurring), has sufficiently argued the claim to have placed it at issue both in the district court (which essentially overlooked the key component of the claim) and in this court. At an absolute minimum, I submit that Eiz-ember’s attempt to raise this issue in the district court and on appeal, combined with the gravity of his sentence, warrants the exercise of our discretion in proceeding to address whether the OCCA and the state trial court, in assessing D.B.’s responses, applied a legal standard that was inconsistent with Witt. See Abernathy v. Wandes, 713 F.3d 538, 552 (10th Cir.2013) (stating that “the decision regarding what issues are appropriate to entertain on appeal in instances of lack of preservation is discretionary.”).

TV. Conclusion

I ultimately conclude, after considering juror D.B.’s written and oral responses as a whole, that she should have been stricken for cause under the Witt/Adams standard and that the state trial court erred in failing to do so. And, because the constitutional requirement of an impartial jury is violated if even a single juror is unable to carry out his or her sworn duties, see Ross v. Oklahoma, 487 U.S. 81, 85, 108 S.Ct. 2273, 101 L.Ed.2d 80 (1988), this error was not harmless. As a result, I conclude that Eizember is entitled to federal habeas relief on this claim, in the form of a new sentencing proceeding.

. In light of this conclusion, I do not reach the other sentencing-related claims asserted by Eizember, including his claim that juror J.S. should have been stricken for cause. After concluding that D.B. was not properly adjudged a fair and impartial juror and, therefore, should not have sat on the jury, whether other jurors also should have been stricken becomes a moot point. See Morgan v. Illinois, 504 U.S. 719, 729, 112 S.Ct. 2222, 119 L.Ed.2d 492 (1992) ("If even one [biased] juror is empaneled and the death sentence is imposed, the State is disentitled to execute the sentence.”). Although the majority states that I do not "dispute that the OCCA both correctly identified and reasonably applied Witt's standard when it came to juror J.S.,” Maj. Op. at 1142, the fact of the matter is that I offer no opinion on the OCCA’s resolution of Eizember’s challenge to juror J.S.

. The OCCA was not alone in doing so. As the Supreme Court discussed in Witt, "[d]e-spite Witherspoon's limited holding, later opinions in this Court and the lower courts have referred to the language in footnote 21 ... as setting the standard for judging the proper exclusion of a juror opposed to capital punishment.” 469 U.S. at 418, 105 S.Ct. 844.

. "[T]he right to jury trial guarantees to the criminally accused a fair trial by a panel of impartial, 'indifferent' jurors." Morgan, 504 *1159 U.S. at 727, 112 S.Ct. 2222. Such "jurors can conscientiously and properly carry out their sworn duty to apply the law to the facts of the particular case.” Lockhart v. McCree, 476 U.S. 162, 184, 106 S.Ct. 1758, 90 L.Ed.2d 137 (1986). In the context of a capital murder case, each juror’s "verdict must be based upon the evidence developed at trial.” Morgan, 504 U.S. at 727, 112 S.Ct. 2222. " '[A] juror who has formed an opinion [prior to trial] cannot be impartial.’ ” Id. (quoting Reynolds v. United States, 98 U.S. 145, 155, 25 L.Ed. 244 (1879)).

. At no point did the state trial court make any comments that reflected the controlling Witt/Adams standard, i.e., whether a venire-person’s views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.

. The majority seems to suggest that the questions posed by the state trial court do not reflect the legal standard that it actually applied in assessing the answers given by the potential jurors. Maj. Op. at 1143 n. 5. If that is true, then what was the point of the state trial court asking these questions? Further, there is nothing in the trial transcript or elsewhere in the record that suggests the state trial court applied a standard different than the one reflected by its questions. Indeed, rarely, if ever, will a trial court issue a written order outlining the legal standard it is applying in assessing the responses of potential jurors. As a result, we are left to examine the oral statements that the trial court makes in the course of examining jurors and ruling on challenges for cause. Doing so in this case reveals that the trial court was, not surprisingly, relying on Oklahoma’s flawed interpretation of Witt (an interpretation that erroneously equated the Wtif standard and the OCCA’s own “irrevocably committed” standard).