Filed 11/8/21

CERTIFIED FOR PUBLICATION

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(San Joaquin)

----

| | |
|---|---|
| THE PEOPLE, | C089782 |
| Plaintiff and Respondent, | (Super. Ct. No. STK-CR-2016-14091) |
| v. | |
| DONTE LATRAILLE REVELS, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Joaquin County, Charlotte J. Orcutt, Judge.  Affirmed.

Robert L. S. Angres, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Darren K. Indermill and Kari Ricci Mueller, Deputy Attorneys General, for Plaintiff and Respondent.

1

Defendant Donte Latraille Revels appeals his convictions for child abuse resulting in death (Pen. Code, § 273ab, subd. (a))[1] and child abuse (§ 273a, subd. (a)). He contends the trial court abused its discretion in denying his motion for mistrial after a testifying expert doctor rendered assistance to an unconscious juror. We conclude there was no abuse of discretion. We do, however, note an error in the minute order and abstract of judgment that require correction. We order the error corrected and affirm the judgment.

FACTUAL AND PROCEDURAL HISTORY

*Charges*

An information charged defendant with child abuse resulting in the death of a child under the age of eight years old (§ 273ab, subd. (a)), and child abuse likely to produce great bodily harm or death (§ 273a, subd. (a)).[2]

*Factual Summary*

Bianca S. had five children, including the victim in this case, two-year-old Ar.S.[3] Bianca and defendant had been dating for about a year and lived together with Bianca's children, Ar.S., Am.S., and Aa.S., and their child together, Z.R.

On the morning of Ar.S.'s death, Bianca and defendant woke up and got the children, ready for the day. Ar.S. had no problem getting ready, including brushing his teeth and getting dressed, and when Bianca left for work around 8:00 a.m., nothing indicated he had any injuries: he had no visible injuries or bruises on his body, and he had no complaints of pain.

---

[1] Undesignated statutory references are to the Penal Code.

[2] Prior to trial, the trial court granted the People's motion to dismiss the first degree murder charge.

[3] To comply with the requirements of protective nondisclosure, the victim is referred to by initials Ar.S., his siblings are A.S., Am.S., and Aa.S.

Defendant dropped Bianca off at the train station at about 8:15 a.m.

Bianca was terminated from work around 11:00 a.m. She called defendant shortly before noon and made plans for him to pick her up from the train station, and also pick up the older children from school early.

Defendant left the house at 12:37 p.m. and picked the children up from school a few minutes later. Bianca arrived at the train station shortly after 1:00 p.m. Defendant arrived to pick Bianca up at approximately 1:30 p.m. Ar.S. was unconscious on defendant's lap, his nails were blue, he had a knot on his head, bruises on his face, and she also saw "noodles" coming out of his nose. She got in the car, directed defendant to the nearest hospital, and began giving Ar.S. CPR. When they arrived at the hospital with Ar.S., Bianca took him in to the emergency room.

As the doctors treated Ar.S., they determined his blood was excessively acidic, indicating a lack of blood flow to his organs. The acidity level indicated he had not been getting sufficient oxygen for an hour or several hours. His lactic acid and electrolyte values were also quite high, indicating he had been deprived of oxygen "for quite some time" and did not have sufficient blood flow. His injuries were not consistent with a single fall.

Ar.S. was declared dead at 2:45 p.m.

*The Prosecution's Expert Testimony*

Dr. Bennet Omalu performed an autopsy on Ar.S. and testified as an expert witness for the prosecution. He concluded the cause of death was blunt force trauma to the head and trunk. He observed 24 distinct impact sites on Ar.S.'s head and face and 22 distinct impact sites on his chest and back. He opined that the injuries were caused by numerous violent impacts to both sides of his face and forehead. Specifically, he believed Ar.S.'s face had either been slammed on a surface or he had been hit directly with an object in the middle of his forehead and on his cheeks. There was a specific pattern of injuries that was consistent with "violent trauma to the abdomen, maybe from a

3

violent punch or kick." There were scars and abrasions on his back suggesting violent impact with an object, but the marks were not consistent with belt marks. One scar on his chest was consistent with a bite mark from an adult or older teenager. There was fresh blood inside the contusion on his forehead and the contusions on his abdomen and chest were a red-pink color, suggesting his injuries were acute and less than a couple of hours old when he died. In Dr. Omalu's opinion, the absence of white blood cells at the injury sites indicated the injuries had occurred within two to four hours earlier. The absence of amyloid precursor protein (APP) in his brain also indicated the injuries had been inflicted by less than four hours before Ar.S. died. Based on the severity of Ar.S.'s injuries, and the condition of his body, including tissue damage, color of trauma, findings in the brain, and the absence of white blood cells and APP, Dr. Omalu concluded the cause of death was blunt force trauma to the head and trunk sustained less than two to four hours before his death.

*The Defense's Expert Testimony*

Dr. Katherine Raven testified as a forensic expert for the defense. She noted she could not independently confirm several of Dr. Omalu's findings, as she was not present during the autopsy and could not discern the details from the photographs. She agreed with Dr. Omalu's conclusion that Ar.S. died from blunt force trauma and that his injuries were not consistent with falling off a play structure. However, she concluded the injuries were less than 24 hours old, but could have been as recent as two hours old. She disagreed with Dr. Omalu's characterization of some of the brain injuries. She also disagreed with his assessment of the timing of the infliction of Ar.S.'s injuries. She challenged Dr. Omalu's reliance on the appearance of the injuries to determine their age, stating that methodology lacked scientific reliability. She noted the state of science only permits a conclusion as precise as within a few hours, but only the broader conclusions, such as that the injury happened within 24 hours or less. She opined the injuries could have been inflicted prior to 7:45 a.m. on the day of death.

4

*Motion for Mistrial*

During Dr. Omalu's testimony, the trial court noticed it appeared one of the alternate jurors had fallen asleep. She was leaning on the chair and her head was down. The judge called her name four times and she did not respond. Dr. Omalu, who had been testifying in the well, walked over to the juror and checked her pulse. He stated, "She doesn't have a pulse," and then apparently responding to the alternate juror said, "You passed out? I think she did. You okay?" The judge then had the jurors taken out of the courtroom and told them to go to lunch. The judge saw Dr. Omalu go to the juror, take her pulse, talk to her, move her body, and sit her up. Another person in the audience also assisted, while some of the jurors were still in the courtroom. That person was both a deputy district attorney and a nurse, but was not identified at all to the jurors. Dr. Omalu did not give the alternate juror CPR, use a stethoscope, blood pressure cuff, or other medical device.

Both Dr. Omalu and the judge said to call 911, but only the judge said that when the jury was still present. The alternate juror regained consciousness and left by ambulance. The jurors did not see her leave by ambulance. The alternate juror had diabetes, had not eaten anything, and had not been taking her medication. The court and the attorneys agreed she should be released as a juror.

Defense counsel indicated he wanted to make a motion for a mistrial. The court stated it needed to poll the jurors on whether they could remain fair and impartial after both seeing the juror passed out and seeing Dr. Omalu give her some medical care, specifically taking her pulse and speaking to her "in a medical fashion." The court advised it would interview them and then send them home for the day.

The trial court reconvened the jury and informed them the alternate juror was doing fine. That she had had a diabetic issue, had not eaten or taken her medicine. When she left she was talking, conscious, and doing well. They had released her as a juror.

5

The jurors were placed under oath, and the court polled the jurors and remaining alternate jurors individually, outside of the presence of the other jurors, asking if the alternate juror passing out would affect their ability to be fair and impartial. As to Dr. Omalu, the court also asked if the fact that Dr. Omalu as "a witness in this case, went over there and treated" the alternate juror would affect their ability to be fair and impartial regarding his testimony, and whether they would be able to evaluate him fairly against other experts and all the other evidence in the case.

One juror did note that they recognized Dr. Omalu from an earlier trial they had sat on 10 years earlier, in which he was also an expert witness. But, also assured the court that would not impact their ability to evaluate his testimony. Another juror stated Dr. Omalu's treatment was a "separate kind of incident" from his testimony, which they thought of more "in terms of his forensic experience."

After hearing all their responses, the court noted on the record it had been keeping notes on the jurors' demeanor, "and they all reacted the same way, they responded very quickly and without hesitation in their responses."

Defense counsel made a motion for a mistrial, arguing that Dr. Omalu's opinion was going to differ from the defense expert's witness, that his having provided medical assistance to one of their fellow jurors would bolster his credibility, and that this was such an exceptional circumstance that the jurors would be unable to disregard that information. The People responded there was no evidence the jurors could not just treat this as an unusual circumstance and remain fair and impartial. The court also provided time for the parties to gather legal authorities and heard additional argument the following day.

After hearing additional argument, the trial court stated the test for a mistrial is "something that happens that's so prejudicial that it's not curable either by admonition or a limiting instruction." The court related what had occurred, and the polling of the jurors and found: "[The jurors] all emphatically said they could be fair even though she passed

6

out, and they can be fair and it doesn't affect their ability to evaluate Dr. Omalu's testimony when they saw [him] go over there and treat her. I take the jurors at their word. They were put under oath and, you know, it's not unexpected that Dr. Omalu, the only doctor in the courtroom, would go over there and treat her. One would expect that, just like if there's a legal issue that came up, everybody would look to me to address that issue. [¶] So based on the fact that the treatment, I would consider as minimal, and all the jurors said it wouldn't affect them, I don't find there was some incurable prejudice that occurred, and the Court is going to deny the motion for a mistrial."

After the conclusion of the defense case-in-chief, defense counsel renewed the motion for mistrial. The court reiterated its earlier ruling, that it had polled the jury members and each had said they could be fair and impartial, so there was no prejudice.

*Judgment*

The jury convicted defendant on both counts. The trial court sentenced him to a term of 25 years to life for child abuse causing death of a child and a concurrent six-year term for child abuse likely to produce death or great bodily injury. The minute order and abstract of judgment reflect a concurrent three-year term.

DISCUSSION

I

Defendant contends the trial court abused its discretion in denying the motion for mistrial based on Dr. Omalu's aid to the alternate juror. He contends that although there was no blame or misconduct, Dr. Omalu's assistance to the alternate juror "undoubtedly enhanced" his credibility with the jurors and therefore impacted the jury's impartiality. He also argues that the fact that the jurors informed the court they could remain impartial did not render the denial of the motion for mistrial a proper exercise of discretion.

"A motion for mistrial is directed to the sound discretion of the trial court. [The Supreme Court] [has] explained that '[a] mistrial should be granted if the court is apprised of prejudice that it judges incurable by admonition or instruction. [Citation.]

7

Whether a particular incident is incurably prejudicial is by its nature a speculative matter, and the trial court is vested with considerable discretion in ruling on mistrial motions.' (*People v. Haskett* (1982) 30 Cal.3d 841, 854.)" (*People v. Jenkins* (2000) 22 Cal.4th 900, 985-986.) " 'A trial court should grant a mistrial only when a party's chances of receiving a fair trial have been irreparably damaged, and we use the deferential abuse of discretion standard to review a trial court ruling denying a mistrial.' [Citations.]" (*People v. Clark* (2011) 52 Cal.4th 856, 990.)

The parties have not cited, and independent research has not revealed, any case directly on point to the unique facts of this case.

Defendant relies largely on out-of-state medical malpractice cases in which the defendant doctor rendered aid to an ailing juror. (*Campbell v. Fox* (1986) 113 Ill.2d 354, 357 [498 N.E.2d 1145, 1146] [during opening statement juror appeared to lose consciousness, with head rolled back, defendant doctor carried her from jury box to counsel table where juror regained consciousness]; *Reome v. Cortland Memorial Hospital* (N.Y.App.Div. 1989) 152 A.D.2d 773, 774 [543 N.Y.S.2d 552, 553] [during a recess in defendant doctor's direct testimony, a juror collapsed after having either a stroke or heart attack; defendant doctor, and others, carried the juror out of the jury box and defendant doctor administered aid "including a blow to the chest," assisted by codefendant doctor with "stethoscope in hand"]; *Heidt v. Argani* (2009) 352 Mont. 86, 87 [214 P.3d 1255, 1257] [after juror became ill during graphic closing argument, she was assisted by the defendant doctor, plaintiff's cocounsel who was a doctor, and three other jurors who were nurses].) In each of these cases, upon questioning, the jurors indicated they could remain impartial. (*Campbell,* 498 N.E.2d at p. 1147; *Reome,* 543 N.Y.S.2d at p. 553; *Heidt,* 214 P.3d at p. 1257.) Each of the appellate courts in those cases concluded it was error not to declare a mistrial because the defendant doctors' responses to the courtroom medical emergencies cast them in a favorable light and predisposed the jurors in their favor. (*Campbell,* at p. 1147; *Reome,* at p. 553; *Heidt,* at pp. 1258-1259.)

8

Those cases are distinguishable from the instant case. In each of those cases, the defendant doctor provided significantly more aid to the ailing juror than Dr. Omalu provided to this juror. At most, Dr. Omalu took her pulse and spoke to her. He did not perform CPR, chest compressions, or other life-saving techniques and did not utilize any specialized medical equipment in providing aid. Perhaps even more importantly, each of those cases, "arose in a unique situation–a medical malpractice trial in which the jury gets to see the defendant doctor reacting to a real-life situation and apparently successfully delivering life-saving care. The effect of this on the jury is immeasurable, whether or not individual jurors admit it or even consciously know it." (*Heidt v. Argani, supra*, 214 P.3d at pp. 1258-1259.) We do not disagree with the conclusion of those cases that medical assistance furnished by a doctor, who is a party in a medical malpractice case, to a juror in the presence of the jury compromises the integrity of the trial. However, Dr. Omalu was not a defendant in a civil malpractice case; he was testifying as a forensic expert witness as to both the cause of death and likely timing of the injuries inflicted. Given his role in this case, as opposed to that of a defendant doctor in a medical malpractice case, taking the pulse of an unconscious juror does not implicate the same concerns of inevitable bias noted in those cases.

The jurors' ability to remain impartial is the issue at the heart of this case; whether the jury could remain impartial in the face of an expert forensic witness providing some aid to an unconscious juror and how to review their assurances they could remain so. "Each criminal defendant is entitled to an impartial jury. [Citations.] That entitlement imposes upon each juror a duty to maintain impartiality throughout the trial. [Citation.] The loss of impartiality requires dismissal of the juror. [Citation.] Loss of impartiality may result from a juror's receipt of information about the case that was not part of the evidence received at trial. [Citation.] A jury must be 'capable and willing to decide the case solely on the evidence before it,' lest a due process violation occur. [Citation.]" (*People v. Mora and Rangel* (2018) 5 Cal.5th 442, 482-483.) "If a juror is able to set

9

aside impressions and opinions to render a verdict based on the evidence presented in court, the juror is impartial. [Citation.] If, on the other hand, the juror forms an opinion so strong that the court is of the belief it cannot be set aside even if the juror does not express it, the juror will be adjudged biased. [Citations.] The evaluation of bias presents a mixed question of law and fact on appeal, the resolution of which obliges this court to review the trial court's examination and the juror's responses. [Citation.]" (*Id.* at p. 485.)

The specific facts of this case are unique. However, the trial court's assessment of a juror's impartiality and the credibility of their assurances to that effect is not unique. It arises in a variety of contexts, including: motions for dismissal for cause of jurors in capital cases opposed to the death penalty (*People v. Martinez* (2009) 47 Cal.4th 399, 438; *People v. Hayes* (1999) 21 Cal.4th 1211, 1285), motions to dismiss empaneled jury due to pretrial publicity (*People v. Riggs* (2008) 44 Cal.4th 248, 281), and motions for dismissal for juror misconduct (*People v. Mora and Rangel, supra*, 5 Cal.5th at pp. 482-483, 485; *People v. Merriman* (2014) 60 Cal.4th 1, 95-96). Generally, these cases provide that the trial court is in the best position to evaluate the credibility of jurors, their demeanor, the nature of the incident, and how the incident likely did or did not affect them.

The state of mind of a juror is essentially a factual question. (*People v. Martinez, supra*, 47 Cal.4th at p. 426.) It " 'is based upon determinations of demeanor and credibility that are peculiarly within a trial judge's province.' " (*Uttecht v. Brown* (2007) 551 U.S. 1, 7 [167 L.Ed.2d 1014].) "[A] trial judge who observes and speaks with a . . . juror and hears that person's responses (noting, among other things, the person's tone of voice, apparent level of confidence, and demeanor), gleans valuable information that simply does not appear on the record." (*People v. Stewart* (2004) 33 Cal.4th 425, 451.) " ' "[T]he manner of the juror while testifying is oftentimes more indicative of the real character of his opinion than his words. That is seen below, but cannot always be spread

upon the record. Care should, therefore, be taken in the reviewing court not to reverse the ruling below upon such a question of fact, except in a clear case." ' " (*Ibid*.) In addition, where the conduct complained of occurs in the trial court's presence, we defer to the trial court's observations. (*People v. Pride* (1992) 3 Cal.4th 195, 259-260 [motion for mistrial denied after juror assured court of impartiality and denied allegations of engaging in misconduct by glaring, eye rolling, shaking his head, and mouthing curses toward defendant].)

Here, the incident complained of occurred in the trial court's presence. The court's observations of what happened is entitled to deference. The juror passed out. She remained in her chair, but her head dropped. She appeared to be asleep. When she did not respond to the trial court calling her name, Dr. Omalu went over to the juror, took her pulse, and may have helped her sit up. He did not perform CPR or use any medical devices. No one performed CPR on the juror in the presence of the other jurors. The majority of aid rendered was rendered outside the presence of the jury. The court noted it was not unexpected that Dr. Omalu would go over and help the juror and that any treatment given was minimal. The court individually polled the jurors, without the other jurors present, explicitly asking if the incident would affect their ability to be impartial or cause them to view Dr. Omalu with increased credibility. The court kept notes of their demeanor as they answered its questions. Each juror responded quickly, without hesitation, and emphatically stated that they could be fair and Dr. Omalu's actions would not affect their ability to evaluate his testimony impartially. Based on the fact that Dr. Omalu's conduct as a doctor was expected of him as a doctor, the treatment provided was minimal, and all of the jurors assured the court under oath that the incident would not affect their ability to be impartial or evaluate Dr. Omalu's testimony, the trial court denied the motion. Based on the trial court's findings, supported by substantial evidence in the record, and the deference they are entitled to, we conclude there was no abuse of discretion in denying the motion for mistrial.

11

## II

Finally, although not raised by either party, we note a clerical error in the abstract of judgment and the minutes. The trial court sentenced defendant to a concurrent upper term of six years on the conviction for child abuse likely to produce great bodily harm or death (§ 273a, subd.(a) - count 3).[4] The minutes and abstract of judgment, however, reflect imposition of a three-year term on count 3. "Where there is a discrepancy between the oral pronouncement of judgment and the minute order or the abstract of judgment, the oral pronouncement controls." (*People v. Zackery* (2007) 147 Cal.App.4th 380, 385.) We will direct the trial court to correct the minute order and abstract of judgment to conform with the oral pronouncement of judgment.

## DISPOSITION

The judgment is affirmed. The trial court is directed to correct the abstract of judgment to reflect the sentence of the upper term of six years on count 3, as set forth in the oral pronouncement of judgment, and forward a certified copy to the Department of Corrections and Rehabilitation.

/s/
HOCH, J.

We concur:

/s/
ROBIE, Acting P. J.

/s/
RENNER, J.

---

[4] The sentencing triad for section 273a, subdivision (a) is two, four, and six years.

12